In re **HEALTH SCIENCE PRODUCTS, INC.,** Debtor.

**HEALTH SCIENCE PRODUCTS, INC.,** Plaintiff,

v.

Jim **TAYLOR** and Anne Taylor, Defendants.

Bankruptcy No. 94–03938–BGC–11. Adv. No. 94–00294.

United States Bankruptcy Court, N.D. Alabama, Southern Division.

April 13, 1995.

Order Amending Decision on Motion to Clarify and Amend May 23, 1995.

Robert Rubin and Timothy Lupinacci, Burr & Forman, Birmingham, AL, for plaintiff-debtor.

Charles Cleveland, Birmingham, AL, for defendants.

## MEMORANDUM OPINION ON THE DEBTOR'S COMPLAINT TO AVOID PREFERENTIAL TRANSFER AND ON THE DEFENDANTS' COUNTERCLAIM

BENJAMIN COHEN, Bankruptcy Judge.

This matter came before the Court for trial on the Complaint to Avoid Preferential Transfer filed by the debtor in possession, Health Science Products, Inc. Appearing were Mr. Robert B. Rubin and Mr. Timothy M. Lupinacci, the attorneys for the plaintiff, Mr. Charles Cleveland, the attorney for the Defendants, and Mr. Jim Taylor and Mrs. Anne Taylor, the Defendants. The matter was submitted on testimony, admitted exhibits, the record in the case and the arguments of counsel.

### I. FINDINGS OF FACT

Health Science Products, Inc., ("HSP") operates a plant for the manufacture of dental equipment in a building located on the real property which is the subject of the present controversy. In 1985, before the building was erected, Mr. Taylor owned the property in fee simple.[1] With the desire to improve the property, Mr. Taylor transferred it to the Birmingham Industrial Development Board ("BIDB") in return for financing for the con-

struction of the building. As evidence of this transaction a deed from Mr. Taylor to the BIDB was executed on August 14, 1985, and was recorded in the probate office of Jefferson County, Alabama, on that day.

To supply the necessary financing for the construction, the BIDB, pursuant to Ala. Code 1975, § 11–54–81 to § 11–54–101, issued and sold $900,000.00 in industrial development bonds.[2] The indenture trustee on the bond issue was AmSouth Bank. With that financing the building was constructed and the BIDB leased the now improved property back to Mr. Taylor. The lease began on August 1, 1985, and is to end on December 10, 1998.[3] The monthly rental reserved to the BIDB, which simply goes to retire the outstanding bonds, increases monthly. For example, the payment for the month in which this opinion was executed is $5,343, while the payment scheduled for the last month of the lease term is $7,437. At the end of the lease term, or when the bond indebtedness is paid in full, whichever occurs first, Mr. Taylor has the option to purchase the fee simple interest in the property for $1.00. The deed from Mr. Taylor to the BIDB, the trust indenture between AmSouth and the BIDB, and the lease between Mr. Taylor and the BIDB were all filed for record in the probate office of Jefferson County, Alabama, on August 14, 1985.

The desire of Mr. Taylor in this matter was not to occupy the property, but to sublet the property, or to sell his interest in the now improved and more valuable property, for a profit. Toward that end, Mr. Taylor advertised the property for "sale or lease." Def.Ex. 27. Sometime in the spring of 1992, Mr. Jim Wells, the president of HSP, wrote the following letter to Mr. Taylor:

Health Science Products, Inc. (HSP) is very interested in *leasing and with an option to acquire your property,* an indus-

---

1. More accurately, the property was owned by Jim Taylor, Inc., a corporation wholly owned by Mr. Taylor, a fact which has no bearing on or relevance to the issues raised in this adversary proceeding.

2. For a clear explanation of the relationships between the usual triumvirate involved in an ordinary industrial development bond issue, that is the lessor municipality, the bond trustee and the lessee of the developed property, and how bankruptcy impacts those relationships, see *In re*

*Martin Brothers Toolmakers, Inc.,* 796 F.2d 1435 (11th Cir.1986).

3. The original lease term was to end on December 31, 2000. As a result of a partial retirement of the bond debt principal made by Mr. Taylor in conjunction with the sale of certain equipment which also stood as collateral for the indebtedness, the lease term was shortened and is now scheduled to end on December 10, 1998.

trial/manufacturing building, located at 1000 11th Court West, Birmingham, Alabama, Arkadelphia Industrial Park.

It is proposed by HSP to **lease the above building for a term of three years at the rate of $3,500 (Three Thousand Five Hundred Dollars) per month net and with the option to purchase the building and property after the end of the three year lease on a ten year seller mortgage contract,** the purchase price shall be $450,-000 (Four Hundred Fifty Thousand Dollars and 00/100) with 6% Interest. **Seller agrees that there is a balance payable to AmSouth Bank, N.A. (AmSouth) $452,-354.61 at April 10, 1992, and seller may at his option pay off the existing bank mortgage or maintain the existing bank mortgage and HSP shall make payment monthly to the seller and the seller agrees to pay monthly to AmSouth, as per the existing terms of the current loan agreement with AmSouth and IDB—the tax exempt revenue bond.** It is understood that the existing interest rate is 90% of the floating AmSouth prime rate currently 5.9584%, subject to change whenever the AmSouth prime interest rate changes. The current monthly payment is $6,611.69. Seller is responsible in full for the payoff of the mortgage to AmSouth Bank, N.A.

**Upon payoff of the existing mortgage to AmSouth, title shall be transferred free and clear to Health Science Products, Inc. when sellers purchase option-mortgage contract has been paid in full by HSP.**

HSP retains the option to refinance the property and payoff in full sellers mortgage contract at any date and time at its sole discretion without any prepayment penalties.

If this offer of intent is accepted by signature below by May 1, 1992, a formal legal purchase agreement shall be entered into and the property shall be assumed by June 1, 1992.

Def.Ex. 29 (emphasis added).

Over the course of a brief period of time following the letter from Mr. Wells to Mr.

**4.** Handwritten notations apparently reflecting calculations of projected principal and interest

Taylor, the two men met and also talked by telephone regarding Mr. Wells' offer. During the course of those discussions, Mr. Wells delivered the following handwritten modification of the offer to Mr. Taylor which read:

To: Mr. Jim Taylor
From: Mr. Jim Wells
Re: Lease with purchase option on industrial building at 1000 11th Court W.

Lease/3yrs: $42,000 year one (1.04 per sq. ft.)
$42,000 year two (1.04 per sq. ft.)
$42,000 year three (1.04 per sq. ft.)
$126,000.00 total lease

Purchase Option Price principal and interest payments $6000.00 month, 10 year mortgage

$450,000.00

10 year seller-held mortgage contract at 6% interest

$576,000.00 + interest
$270,000.00 interest based at 6%
over a 10 year
mortgage

$846,000.00 Total

Def.Ex. 4.[4]

Mr. Taylor, in response, delivered a counteroffer to Mr. Wells which read:

Date: May 1, 1992
To: Mr. Jim Wells
From: Jim Taylor

Re: Lease with Purchase Option on 1000 11th Court West Birmingham, Alabama

A. LEASE

1. One to three years effective June 1, 1992

Year One $53,207.00 to 6/10/93
Year Two 58,141.00 to 6/10/94
Year three 63,355.00 to 6/10/95

Three Years
Total Lease
Payments $174,703.00

2. Triple Net Lease (HSP to be responsible for insurance, maintenance and taxes)

have not been reproduced.

B. Purchase Option Price Less Principal Paid During time of lease:

$600,000.00 Seller-held Mortgage Contract at Floating Prime Interest for 10 years.

C. HSP reserves the right to assume and/or refinance the mortgage directly with AmSouth Bank at whatever date and time at HSP's option.

If HSP chooses to refinance the property at any time the sales price shall be paid in full, less the principal paid during the period of occupancy since June 1, 1992.

*Upon payoff of the existing mortgage to AmSouth Bank or to the seller, title shall be transferred free and clear to HSP, Inc.*

If this offer is accepted a formal legal purchase agreement shall be entered into and the property shall be occupied by June 1, 1992.

Def.Ex. 5 (emphasis added).

On May 1, 1992, the parties met for the purpose of finalizing an agreement for HSP's occupation and use of the property. Mr. Taylor and his attorney, Mr. Richard Davis, and Mr. Wells and his attorney, Mr. Donald Harris, attended the meeting. The result of the meeting was memorialized in a document entitled "Purchase Agreement for the Property Located at 1000 11th Court West," which was signed on that date by both Mr. Taylor and Mr. Wells. That document read:

Date: May 1, 1992
To: Jim Wells, President, HSP
From: Jim Taylor, Owner–Seller

Re: 13 year Seller Mortgage Contract

I. Seller offers purchaser a 13 year seller held mortgage contract, with the first three years no interest and the last ten years at Citibank Floating prime interest rate. The following is the building principal payment schedule during the first three years and the end of each year's remaining principal balance due.

| Purchase Price of Building | | | $600,000 |
| Time Period | Monthly Payment | Yearly Payments | End of Year Balance |
|---|---|---|---|
| Year one | $3,500 | $42,000 | $558,000 |
| Year two | $4,200 | $50,400 | $507,600 |
| Year three | $4,700 | $56,400 | $451,200 |

**5.** Handwritten below the signature lines at the bottom of the document was the following nota-

II. Beginning the first month of the fourth year the remaining balance of the unpaid principal owed, or $451,200, is to be amortized over ten years at the Citibank prime interest rate effective June 1, 1995, and the monthly payment for that year will remain constant. The Citibank prime interest rate has historically fluctuated monthly. If the average rate for the year is higher than the rate at the beginning of the year, HSP will pay this interest difference to seller on the first month of the next year. If the average interest rate is lower during the year, this reduced interest will be deducted from the first monthly payment at the beginning of the next year.

At the beginning of each year thereafter (June 1st), the monthly payment will be recomputed at the Citibank prime interest rate and the monthly payment either increased or decreased, appropriately. The following would be the monthly payment for year four at various prime interest rates:

| Rate | Payment |
|---|---|
| 6.5% | $5,124 |
| 7.5% | $5,356 |
| 8.5% | $5,594 |
| 9.5% | $5,838 |

III. A. *HSP reserves the right to refinance the remaining mortgage balance due at the end of any month, beginning June 1, 1992, with any entity or financial institution of its choosing, and pay the seller the remaining principal balance due. The seller agrees to pay AmSouth Bank, N.A., in full, its obligation to AmSouth Bank, N.A., and transfer free and clear title to HSP.*

B. Purchaser agrees to carry insurance and perform all necessary building maintenance.

C. *Seller has an IDB and there is no property tax payable until December 10, 1998. Purchaser agrees to assume and pay all property tax assessments after December 10, 1998.*

Def.Ex. 7 (emphasis added).[5]

No other documents were prepared or signed at the May 1 meeting. Mr. Taylor

tion which was initialled by Mr. Wells: "HSP to

agreed to allow HSP to occupy the building prior to the first payment becoming due under the purchase agreement. Accordingly, HSP began using the property in May, 1992.

Next in the order of relevant events, Mr. Harris ordered and obtained a commitment for title insurance. As would be expected, the title commitment indicated that title to the property was in the BIDB, and not Mr. Taylor, and the commitment stated the lease agreement between the BIDB and Mr. Taylor was an exception to the commitment. The commitment specified that a warranty deed should be executed by the BIDB and Mr. Taylor to HSP and that the mortgage and trust indenture from the BIDB to Am-South should be paid in full and satisfied of record, before title insurance could be issued. Upon receipt of the title insurance commitment, Mr. Harris wrote Mr. Davis on May 14, 1992 stating:

> Please find enclosed herein a copy of the title commitment in reference to the above styled real estate matter. I am somewhat concerned as I had questioned in my fax of the 13th, that title is vested in the Industrial Development Board of the City of Birmingham. I am assuming that the reason for this is because of the bond issue with the bank. Of course there are other matters that we need to clear up in reference to the title policy but this one is of the greatest concern to me, and if my assumption is correct then all we would need to do is take a look at the necessary paperwork vesting title in Mr. Taylor subject to the payoff of the mortgage. I would further direct your attention to items number seven (7) and eight (8) of the Schedule B Section 1 wherein we have outstanding UCC documentation filed with the Secretary of State. I assume this also is in reference under number seven (7), to Am-South Bank and the bond issue. In the matter of number eight (8), I am not certain but this may in fact be a supplier of Mr. Taylor's previous business. If in fact assume property insurance and building effective May 1, 1992."

6. The Debtor was aware of course that Mr. Taylor did not hold title to the real estate, since Mr. Harris participated in the May 1 meeting where

same is true then we would of course need a release.

I would also like to take a look at the lease agreement as referenced in Volume 2752 page 472, on the front page of the commitment, as well as item number three (3) of Schedule B Section 2. As soon as title is transferred to this property, it will be absolutely essential and necessary that this lease agreement expire, and that title pass pursuant to a warranty deed to my client. *It certainly appears from a review of this title commitment, that Mr. Taylor is in no capacity to actually convey the property to my client, and I would like to be able to properly advise him as to the current status. This was of course certainly not within my knowledge, and after a review of the documentation, I believe that we will be in a position to better advise both of our clients in regards to going further with this deal. Of course all of the problems that are incumbent in the title commitment are covered in the documentation (sic) has previously been signed, and Mr. Taylor has ample time and opportunity to cure any defects that we have set out. I am sure that these are in fact not defects, but are matters that can be easily worked out, and I will look forward to hearing from you in this regard.*

Def.Ex. 9 (emphasis added).[6]

In response to Mr. Harris's letter of May 14, Mr. Davis sent Mr. Harris a letter dated May 21 which read, in relevant part, as follows:

> Due to the nature of the bond issue, title to the real estate is presently vested in the Industrial Development Board of the City of Birmingham and Mr. Taylor has a lease with the Board for a period of years. The original term of the lease was through December 31, 2000 (SECTION 4.01 on pages 6 & 7) but due to an additional payment Mr. Taylor was required to make

the sales contract between Mr. Taylor and HSP was drafted and executed and the sales contract specifically referred to the industrial development bond issue and the bond indebtedness owed to AmSouth.

at the time he sold the stock in his company, the term was reduced by two (2) years. Under SECTION 9.03 on page 30 of the Lease, Mr. Taylor has the option to purchase the project at the end of the lease term for the purchase price of $1.00. I have enclosed a copy of the Lease for your review.

Def.Ex. 10.

Negotiations continued and document drafts were sent back and forth between the parties and their attorneys. Included with these drafts were drafts of a promissory note, a mortgage, a warranty deed and another "purchase agreement." On July 14, 1992, Mr. Harris wrote Mr. Davis the following:

> I have now reviewed the original promissory note and mortgage with my client. He asked me for some additional time to in fact review the documentation on his own. Accordingly, I thought I would take this time to forward to you the copy of the original warranty deed that I have prepared in this matter. I would of course like for Mr. Taylor and his wife to execute this document and *we will keep it on file without the necessity of recording same.*

Def.Ex. 14 (emphasis added).

On August 13, 1992, Mr. Davis wrote his client, Mr. Taylor, explaining:

> I have enclosed the Deed that Mr. Wells' attorney forwarded to me that you and Anne need to sign. The attorney failed to put an "e" on Anne's name but rather than send it back to him, I had my secretary add the "e". It crowded things a bit but at least the name is correctly spelled. I need for the two of you to sign the Deed in the space above your names and then if you will return it to me I will notarize your signatures. (I know both of your signatures and don't mind doing that—that will save you having to come all the way out to the office).
>
> I have sent our documents (the Note and Mortgage) to Mr. Wells' attorney and they should be coming back soon. As soon as I receive them, *I will delivery (sic) all of the documents to Mr. Wells' attorney for him to keep, in his file.*

Def.Ex. 15 (emphasis added).

On the same day, Mr. Davis wrote Mr. Harris the following letter:

> I have forwarded the deed on to Jim and Anne for them to sign and I should be getting it back in the next few days. *Once I receive it I will send it over to you for safe-keeping.*
>
> We also need to finalize the note and mortgage so if you and Mr. Wells have any comments I would appreciate your getting them to me so we can get those documents executed as well.

Def.Ex. 16 (emphasis added). A copy of this letter was sent to Mr. Taylor.

Upon receipt of the August 13 letter from Mr. Davis, and the copy of the August 13 letter from Mr. Davis to Mr. Harris, Mr. Taylor called Mr. Davis and informed him that the deed to the property was not to be delivered to either HSP or Mr. Harris until the entire agreed upon purchase price was paid in full. Mr. Davis advised Mr. Taylor that he would comply with his directions and retain the deed in his file for safekeeping. Mr. and Mrs. Taylor signed the deed, but did not date it, and mailed it to Mr. Davis. The Taylors' signatures were neither witnessed nor acknowledged at the time they actually signed the deed, but upon receipt of the deed, Mr. Davis entered the date "May 1, 1992" on the signature part of the deed under the Taylors' signatures, and signed and placed his notary seal on the printed portion of the deed intended for the acknowledgement of the grantors' signatures, thereby certifying that the Taylors actually appeared before him in his capacity as a notary public on May 1, 1992, and "executed the same [deed] voluntarily on the day the same bears date," Pla.Ex. 1 (parenthetical added), when, in actuality, the Taylors had not signed the deed in his presence and had signed the deed in August 1992.

The deed, which was prepared by Mr. Harris, is a standard form warranty deed without rights of survivorship. It purports to convey title in fee simple, and further contains the following relevant language:

And I (we) do for myself (ourselves) and for my (our) heirs, executors, and administrators covenant with said GRANTEES, their heir and assigns, that I am (we are) lawfully seized in fee simple of said premises; that they are free from all encumbrances, unless otherwise noted above; that I (we) have a right to sell and convey the same as aforesaid; that I (we) and my (our) heirs, executors, and administrators shall warrant and defend the same to said GRANTEES, their heirs and assigns forever, against the lawful claims of all persons.

Pla.Ex. 1.

After "acknowledging" the deed, Mr. Davis placed it in his file. The deed was not delivered to either Mr. Wells, HSP, or Mr. Harris, and was not recorded at that time. According to all of the testimony, the deed was never physically delivered to Mr. Wells, HSP or Mr. Harris.

On October 9, 1992, Mr. Davis wrote a letter to Mr. Harris which contained the following language:

I have made the change on the mortgage that you and I discussed and have enclosed the new mortgage as well as the original note. Please have these signed and then give me a call and we can coordinate things on the *holding of the original documents.*

Def.Ex. 17 (emphasis added).

On November 11, 1992, Mr. Harris wrote a letter to Mr. Davis which contained the following language:

Please find enclosed herein the executed Mortgage and Promissory Note in the matter styled above. I trust that the executed Deed is on its way to me. Of course we will file our own documents for record and this should conclude this matter.

Def.Ex. 18.

Included with the November 11 letter from Mr. Harris to Mr. Davis was a promissory note from HSP to Mr. Taylor in the principal sum of $600,000 and a mortgage from HSP to Mr. Taylor purporting to be signed on May 1, 1992, by Mr. Wells as President of HSP. The acknowledgement of Mr. Wells's signature, however, is dated November 11, 1992.

Since the correspondence between the two attorneys and the testimony of the participants at the May 1 meeting indicates that the mortgage and note were definitely *not* executed on May 1, and were not even prepared in final form until November, this Court finds that the documents were executed on November 11, 1992.

The note contains the following provisions that are of particular relevance to the present discussion:

2. (a) Borrower will make payments according to the schedule set forth in paragraph 3 of that certain Commercial/Industrial Sales Contract executed by Borrower and Holder, a copy of such contract is attached hereto as Exhibit "A". Monthly payments will be made on the 1st day of each month beginning with June 1, 1992. Borrower's monthly payments will be applied first to late charges, if any, then to interest, if any is then due, and then to principal.

. . . . .

Payments shall be due on the 1st day of each month and will be delinquent, if not actually received in the office of the Holder by the 10th day of the following month. In the event payments are not received at the address of Holder by 4:30 p.m. on the 10th of each month, *a late charge equal to any late charges assessed Holder by Am-South Bank, N.A. will be assessed against Borrower.*

Def.Ex. 19 (emphasis added).

The mortgage is basically a standard form mortgage but contains the following especially relevant provisions:

BORROWER COVENANTS that Borrower is lawfully seized of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

. . . . .

17. Transfer of the Property or a Beneficial Interest in Borrower. If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by lender if exercise is prohibited by federal law as of the date of this Security Instrument.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies provided by this Security Instrument without further notice or demand by Borrower.

Def.Ex. 20.

Attached to the note as "Exhibit A", as referred to in the above quoted paragraph from the note, is a document entitled "Commercial/Industrial Sales Contract" and purports to be a contract for the purchase of the property by HSP. Although the document purports to have been signed by the parties on May 1, it was in fact executed several months following that date. What effect execution of the document by HSP and the Taylors was to have on the "Purchase Agreement" executed on May 1 was not a subject of the testimony presented and this Court can only speculate. The attachment may have been intended to supersede the previous agreement, or parts of the previous agreement; or its purpose may have been merely to clarify the rights of the parties as outlined in the previous agreement, and in that sense, the document may have been intended as a further refinement of the previous agreement. In any event, the "Commercial/Industrial Sales Contract" contains the following provisions of interest:

2. Seller's Title. Jim Taylor and wife Ann Taylor, (Seller) agrees to sell the real estate and the property described above, if any, at the price and terms set forth herein, and to convey or cause to be conveyed to Purchaser thereto by a recordable warranty deed, with release of homestead rights, if any, subject only to (a) covenants, conditions and restriction of record; (b) private, public and utility easements and roads and highways, if any; (c) installments not due at the date hereof of any special tax or assessment for improvements heretofore completed; (d) mortgage or trust deed specified below, if any; (e) general taxes for the year 1998 and subsequent years including taxes which may accrue by reason of new or additional improvements during the year 1998.

Health Science Products, Inc. reserves the right to refinance the remaining mortgage balance due at the end of any month, beginning June 1, 1992, with any entity or financial institution of its choosing, and pay the Seller the remaining principal balance due. The Seller agrees to pay AmSouth Bank, N.A., in full, its obligation to AmSouth Bank, N.A., and transfer free and clear title to Health Science Products, Inc.

The Seller reserves the right to refinance or repay the bond issue, subject of the AmSouth Bank loan at his discretion. Purchaser shall be notified of Seller's intention to refinance at least thirty (30) days prior to said refinance. Sellers does agree that he will receive full permission under the terms of the IDB loan to not affect the tax structure and tax basis of the bond indebtedness so as to create taxable consequences on a yearly basis to the Purchaser prior to 1998. If for any reason the tax structure should change the Seller should be responsible for all payment of taxes and assessments as affected by the refinance subject to this paragraph.

All payments shall be due on the first (1st) day on each month and shall be late after the tenth (10th). Late charges shall accrue to the purchaser pursuant to late charges from AmSouth Bank as assessed to the Seller. Seller shall notify purchaser of these late charges and purchaser shall be responsible for same if each such pay-

ment is made after the tenth day of the month.

7. The contract also included other provisions which may appear to answer some of the questions before the Court but which upon close analysis do not. As explained below, these provisions are inconclusive. They are however relevant and read as follows:

5. Closing. The time of closing shall be on the first day of May, 1992 or on the date, if any to which such time is extended by reason of paragraph two (2) of the Conditions and Stipulations hereafter becoming operative (whichever date is later, unless subsequently mutually agreed otherwise, at the office of Donald R. Harris, Jr., Attorney for the Purchaser or of the mortgage lender, if any, provided title is shown to be good or is accepted by the purchaser.

. . . .

1. Title. Purchaser shall deliver or cause to be delivered to Purchaser or Purchaser's agent, not less than 5 days prior to the time of closing, the plat of survey (if one is required to be delivered under the terms of this contract) and a title commitment for an owner's title insurance policy issued by Title Insurance Company in the amount of the purchase price, covering title to the real estate on or after the date hereof, showing title in the intended grantor subject only to (a) the general exceptions contained in the policy, (b) the title exceptions set forth above, and (c) title exceptions pertaining to liens and encumbrances of a definite and ascertainable amount which may be removed by the payment of money at the time of closing and which the Seller may so remove at that time by using the funds to be paid upon the delivery of the deed (all of which are herein referred to as the permitted exceptions). The title commitment shall be conclusive evidence of good title as therein shown as to all matters insured by the policy, subject only to the exceptions therein stated. Seller also shall furnish Purchaser an affidavit of title in customary form covering the date of closing and showing title in Seller subject only to the permitted exceptions in foregoing items (b) and (c) and unpermitted exceptions and defects in the title disclosed by the survey, if any, as to which the title insurer commits to extend insurance in the manner specified in paragraph 2 below.

2. Defects. If the title commitment or the plat of survey (if one is required to be delivered under the terms of this contract) discloses either unpermitted exceptions or survey matters that render the title unmarketable (herein referred to as "survey defects"), Seller shall have thirty (30) days from the date of delivery thereof to have the exceptions removed from the commitment or to correct such survey defects or to have the title insurer commit to insure against loss or damage that may be occasioned by such exceptions of survey defects, and, in such event, the time of closing shall be thirty

"Exhibit A" to Def.Ex. 19.[7]

According to the testimony, no further dis-

five (35) days after delivery of the commitment or the time expressly specified in paragraph five (5) on the front page hereof, whichever is later. If Seller fails to have the exceptions removed or correct any survey defects, or in the alternative, to obtain the commitment for title insurance specified above as to such exceptions or survey defects within the specified time, Purchaser may terminate this contract or may elect, upon notice to Seller within ten (10) days after the expiration of the thirty (30) day period, to take title as it then is with the right to deduct from the purchase price liens or encumbrances of a definite and ascertainable amount. If the Purchaser does not so elect, this contract shall become null and void without further action of the parties.

"Exhibit A" to Def. Ex. 19.

The provisions quoted above appear to contain boilerplate language which has been ignored by the parties. The provision regarding a formal closing of the transaction contained in paragraph 5 is surplus. There was no closing and in fact no closing was contemplated by the parties, as indicated in the testimony cited in footnote number 31, infra. The date specified for the closing had passed before the contract was executed. The reference in paragraph 1 (quoted above) in the "Conditions and Stipulations" portion of the contract to an affidavit of title to be delivered by the Seller covering the "date of closing," is, it follows, of no import, since there was no "date of closing." The reference in the same paragraph to title exceptions which the seller can remove "by the payment of money at the time of closing and which the Seller may so remove at that time by using funds to be paid upon the delivery of the deed" has no meaning within the framework of the transaction. There was no "time of closing" and the contract did not require a down payment or other lump sum payment to be made by HSP at any time.

Paragraph 2 (quoted above) of the "Conditions and Stipulations," which provides for the purchaser's remedy in the event the seller fails to cure title defects, cannot be reconciled with the knowledge of the parties at the time the contract was executed, as well as with the behavior of the parties following the execution of the contract. Specifically paragraph 2 provides that in the event the seller fails to cure title defects within 30 days following delivery of the title commitment, the purchaser can either terminate the contract or, upon notice given within 10 days, take title as is with the right to deduct the amount of encumbrances from the purchase price. As will be discussed later in this opinion, Mr. Wells and HSP knew that BIDB and AmSouth both had interests in the property and contemplated that Mr. Taylor would not obtain title to the property until December, 1998. Furthermore, the record is bare of any facts that would indicate that HSP gave the requisite 10

cussions, conversations, meetings, negotiations, or exchanges of correspondence or other documents took place between the parties, or between their lawyers, regarding either the sale of the property or the delivery or recording of the deed, note or mortgage, after November 11, 1992. No additional documents were prepared regarding the transfer of the property, and none of the existing documents were altered or amended.

HSP continued to occupy the premises and to make payments to Mr. Taylor under the terms of the note and purchase agreement although most of the payments made by HSP were tardy, resulting in the accrual of late charges. The payments stopped completely in April 1994, and in April or May 1994 Mr. Taylor retained additional attorneys to pursue collection of the amounts due under the contract and to obtain possession of the property. Ms. Mary Douglas Hawkins, one of those attorneys, was assigned the task and was given Mr. Taylor's file. This file contained the original deed, mortgage and note. On May 20, 1994, Ms. Hawkins sent a letter to Mr. Wells which read:

> Reference is made to my letter to you dated May 3, 1994, regarding the delinquent status of the payments due Jim Taylor under that certain Promissory Note dated May 1, 1992.
>
> The payments for the months of April and May 1994 in the amount of $4,200.00 each have not been made as of this date. Additionally, there is a late charge in the amount of $97.50 due for the month of May 1994.
>
> Demand is hereby made upon Health Science Products, Inc., to remit to this

office by certified check, no later than 4:30 o'clock p.m. on May 31, 1994, the April and May 1994 payments in the amount of $4,200.00 each, together with the late charge for May 1994 in the amount of $97.50 and a reasonable attorney's fee in the amount of $350.00, as provided in said Note. The total amount due and payable is the sum of $8,847.50.

> Due to the continuing defaults of Health Science Products, Inc., Mr. Taylor has elected to terminate the tenancy of Health Science Products, Inc., effective June 1, 1994.

Def.Ex. 22.

Shortly after sending this letter, Ms. Hawkins *recorded the deed and mortgage* and started foreclosure proceedings, but because she was in China on the date of the trial of this matter, she has not had an opportunity to explain the recordation. The parties agreed however to stipulate to what her testimony would be and verbally announced that stipulation in open court. The facts that this Court can clearly glean from the stipulation are that (a) Ms. Hawkins recorded the deed, mortgage and note with the probate office of Jefferson County, Alabama, on June 9, 1994; (b) Mr. Taylor paid the recording fees; (c) Ms. Hawkins did not know that Mr. Taylor did not hold title to the property; (d) Ms. Hawkins did not know of any agreement or understanding that the deed was not to be delivered or recorded; (e) Ms. Hawkins did not physically deliver the deed to either HSP, Mr. Wells or Mr. Harris; and (e) Ms. Hawkins made the decision to begin the foreclosure process.[8]

---

day notice, even though the title commitment was obtained by HSP in early May 1992 and clearly HSP did not terminate the contract.

The fact that no one involved in the transaction has either questioned the fact that there was no formal closing or suggested that a closing take place in the almost three year period since the contract was executed, and the fact that HSP did not question title to the property during the same period, lend support to one of following conclusions: (a) that the above quoted provisions of the contract are mere surplusage, and of no legal import, or (b) that the provisions have been waived by the parties, or (c) that the interpretation of the transaction advocated by Mr. Taylor, that title to the property is not to be delivered until December 1998, is correct. Those same

facts tend to rebut HSP's contention that Mr. Taylor was to transfer title to the property before that time.

Of course, if the parties intended "closing" to refer to a date following December 10, 1998, when the lease to Mr. Taylor expires and Mr. Taylor actually acquires title to the property, the above quoted provisions of the contract do have utility. After that date, Mr. Taylor can obtain clear title, and can obtain a title insurance commitment which will not contain exceptions for the interests of AmSouth and BIDB.

**8.** The stipulation regarding the substance of Ms. Hawkins "testimony" was:

> MR. CLEVELAND: Mary Douglas Hawkins is an attorney and is in the firm Corretti & New-

Subsequent to recording the deed and mortgage, Ms. Hawkins wrote Mr. Wells to notify him of the impending "foreclosure" sale to be held on July 27, 1994 and advertised the "foreclosure" in a newspaper of general circulation, as required by Alabama law. On July 6, 1994, HSP filed its bankruptcy petition in this Court. As of the date of the trial of this matter, there was a deficiency of principal payments under the Contract between HSP and Mr. Taylor of $31,900.00.

## II. HSP'S CONTENTIONS

HSP filed the present adversary proceeding against Mr. and Mrs. Taylor. As a basis of complaint, HSP contends that:

1. The recordation of the mortgage given by HSP to Mr. and Mrs. Taylor within 90 days of bankruptcy constitutes a preference avoidable pursuant to 11 U.S.C. § 547.

2. By giving HSP a fee simple warranty deed, Mr. and Mrs. Taylor covenanted that they held fee simple title to the property and that the property was free of encumbrances, and that since the debt to AmSouth remains outstanding, Mr. and Mrs. Taylor have breached covenants of title and against encumbrances and must therefore pay damages to HSP.

3. The debt owed by HSP to Mr. and Mrs. Taylor should be equitably subordinated because of Mr. and Mrs. Taylor's purported inequitable conduct exhibited toward HSP by not transferring clear title to the property.

4. Mr. Taylor has done several things in violation of the automatic stay which have resulted in damages to HSP for which Mr. Taylor should be held liable under 11 U.S.C. § 362(h).

## III. CONCLUSIONS OF LAW

A significant disagreement between the parties involved the question of whether or not Mr. Taylor delivered a deed to HSP, a requirement under Alabama law to effectuate a transfer of title to real property. This Court, as indicated below, has specifically determined that delivery of the deed did not occur, and has decided the issues raised by HSP's complaint accordingly. This Court has also considered the issues raised by HSP's complaint based on the assumption that the recordation of the deed was delivery of the deed to HSP. Even then, the Court has determined that there is no basis for granting any portion of the relief requested by HSP.

### A. PREFERENTIAL TRANSFER ISSUES

### 1. THE "TRANSFER" WAS PERFECTED MORE THAN 90 DAYS BEFORE BANKRUPTCY

 Section 547(b) of the Bankruptcy Code makes avoidable certain transfers of property made by a debtor within 90 days of the filing of the bankruptcy petition. A

---

som and was representing Mr. Taylor February 1994, or that period of time. And she will testify that she recorded the deed and mortgage that's in evidence that was recorded. That at the time she recorded it she did not know that Mr. Taylor only had a lease to the property. And she did not know of any agreement not to record and deliver the deed and—
MR. RUBIN: If one existed.
MR. CLEVELAND: If one existed. She was not aware of any agreement. I mean, you are not stipulating that there was?
MR. RUBIN: No.
MR. CLEVELAND: Then she will testify that she made the decision to commence—did I say that Mr. Taylor paid the cost of recording?
MR. RUBIN: No.
MR. CLEVELAND: Mr. Taylor paid the cost of recording, and Ms. Hawkins will testify that she made the decision to commence with the foreclosure proceedings. And she would testify that she sent the letters that are in evidence with her name on them.
THE COURT: She would testify that she made the decision to commence with the foreclosure proceeding?
MR. CLEVELAND: Yes.
THE COURT: After consulting with Mr. Taylor, or on Mr. Taylor's behalf or—
MR. CLEVELAND: She was representing Mr. Taylor at the time. I don't think they wanted to consent to the conversations between—
MR. RUBIN: Our view of the testimony is that it was an authorized act of his agent.
THE COURT: Okay. That was my question. It sounded to me like she made it independent of Mr. Taylor. But if it was authorized—
MR. CLEVELAND: She was representing him at the time.
Transcript at 79–81.

transfer takes place, according to Section 547(e)(2)(A), at the time the transfer takes effect between the debtor and the transferee, if the transfer is "perfected" at the same time or within 10 days thereafter. A transfer of real property is "perfected" when a bona fide purchaser of the property *from the debtor* cannot acquire an interest that is superior to the interest of the transferee in the property. 11 U.S.C. § 547(e)(1)(A). Since a bona fide purchaser could only acquire rights in real property transferred by the debtor by virtue of state law, Section 547(e)(1)(A)'s "apparent command is to test the effectiveness of a transfer, as against the trustee, by the standards which applicable state law would enforce against a good faith purchaser." *McKenzie v. Irving Trust Co.*, 323 U.S. 365, 370, 65 S.Ct. 405, 408, 89 L.Ed. 305 (1945). "The state standards which control the effectiveness of a transfer likewise determine the precise time when a transfer is deemed to have been made or perfected." *Id.*[9]

▮ Under Alabama law, a bona fide purchaser of real property is one who (1) purchases legal title to the property, (2) in good faith, (3) for adequate consideration, (4) without notice of any claim or interest in the property by any other party. *Rolling "R" Construction, Inc. v. Dodd*, 477 So.2d 330, 331 (Ala.1985).[10] By definition, therefore, neither HSP nor any transferee from HSP, could be a bona fide purchaser of the property involved in this case.

▮ Although the facts of this case are difficult to follow, certain legal principles are clear. First, HSP does not hold legal title to the property and therefore cannot convey legal title to a bona fide purchaser.[11] HSP's interest in the property came by way of transfer from Mr. Taylor. Mr. Taylor holds only a leasehold in the property with an option to purchase the property at the end of the lease term. Neither of these interests constitutes legal title to the property, which property, of course, is owned by the BIDB. Mr. Taylor could neither convey to HSP any greater interest in the property, nor could create in HSP any greater rights in the property, than what he actually owns.[12] And since Mr. Taylor does not own legal title to the property, he could not convey legal title to the property to HSP. And since there was no legal title that HSP could receive, it does not hold legal title to the property, and could not have conveyed legal title to the property to anyone during the 90 day period preceding bankruptcy, or on any other occasion for that matter. In fact, since no one can obtain legal title to the property from HSP, there can be no bona fide purchaser

---

9. The determination of when a transfer is perfected for purposes of Section 547 must be made by reference to state law. *In re Conner*, 733 F.2d 1560 (11th Cir.1984).

10. *Manning v. Wingo*, 577 So.2d 865, 868 (Ala. 1991); *Perine v. Jackson*, 545 So.2d 1318, 1319 (Ala.1988); *Larkins v. Howard*, 252 Ala. 9, 12, 39 So.2d 224, 226 (1949).

11. "One cannot be a bona purchaser where his grantor did not have the legal title to convey." *Shook v. Southern B. & L. Ass'n*, 140 Ala. 575, 579, 37 So. 409 (1904). *See also, Manning v. Wingo*, 577 So.2d 865, 868 (Ala.1991) (deed signed by will beneficiary and by another person as executor of the testator's estate was void where only the beneficiary was named as the grantor and the beneficiary did not own the property at the time of the conveyance, so that grantees named in deed were not bona fide purchasers for value); *Sherrod v. Hollywood Holding Corp.*, 233 Ala. 557, 560, 173 So. 33 (1937) (where grantee in a deed held in escrow gave a mortgage before fulfillment of the escrow agreement, a purchaser of such mortgage was not protected as a bona fide purchaser against a purchase-money mortgage that was included in the original escrow agreement, since no title had passed pending delivery of the deed in escrow which could be conveyed); *Hess v. Hodges*, 201 Ala. 309, 310, 78 So. 85 (1918) (where grantor did not have legal title because description in recorded deed to him was defective, his grantee could not be a bona fide purchaser of value without notice); *Gibson v. Gibson*, 200 Ala. 591, 76 So. 949 (1917) (grantee's mortgagee did not acquire legal title and was therefore not entitled to protection against vendor's lien resulting from payment of purchase price of property by a third party, where deed was delivered in escrow and grantee failed to perform his part of the agreement upon which delivery was dependent).

12. The grantee of an estate takes no greater estate in the property than the grantor can convey. *Todd v. Devaney*, 265 Ala. 486, 488, 92 So.2d 24, 25 (1957); *Vaughn v. Brue*, 245 Ala. 107, 111, 16 So.2d 17 (1943); *Sibley v. McMahon*, 210 Ala. 598, 600, 98 So. 805 (1924); *Bank of Hartford v. Buffalow*, 217 Ala. 583, 584–585, 117 So. 183 (1928); *Potter v. Owens*, 535 So.2d 173, 175 (Ala.Civ.App.1988).

from HSP; consequently, there can be no preference.

■ Second, in order to be a bona fide purchaser of real property, one must purchase the property without notice of any claim or interest in the property by any other party.[13] Under Alabama law, the recordation of any document purporting to convey an interest in real property in the office of the probate judge in the county where the property is situated constitutes notice of the contents of the document to all subsequent purchasers, mortgagees, and judgement creditors.[14] The deed from Mr. Taylor to the BIDB, the trust indenture between the BIDB and AmSouth, and the lease agreement between the BIDB and Mr. Taylor were all filed for record in the office of the probate judge of Jefferson County, Alabama on August 14, 1985. From that point forward, any potential transferee of the property, from HSP or anyone else, was on constructive notice of what appears in the language of those documents, including the fact that the BIDB holds legal title to the property, and that the property is subject to the trust indenture in favor of AmSouth, and that Mr. Taylor holds a leasehold with an option to purchase the property. Conversely, until recordation of the deed from Mr. Taylor to HSP, there was no document of record that would indicate to potential transferees that HSP had *any interest in the property at all.* Until Mr. Taylor actually conveyed his interest in the property to HSP, HSP was in possession of the property as a vendee of Mr. Taylor's interest under an executory contract for the purchase of the property.[15] By virtue of the recordation of the lease agreement from the BIDB to Mr. Taylor, and the lack of any document of record showing a transfer of that interest to HSP, any transferee from HSP would have been on notice of Mr. Taylor's interest in the property, and, therefore, could not have ob-

---

**13.** *Manning v. Wingo,* 577 So.2d 865, 868 (Ala. 1991); *Perine v. Jackson,* 545 So.2d 1318, 1319 (Ala.1988); *Rolling "R" Construction, Inc., v. Dodd,* 477 So.2d 330, 332 (Ala.1985); *Walker v. Wilson,* 469 So.2d 580, 582 (Ala.1985); *Larkins v. Howard,* 252 Ala. 9, 12, 39 So.2d 224, 226 (1949); *Sherrod v. Hollywood Holding Corp.,* 233 Ala. 557, 560, 173 So. 33 (1937).

**14.** "Under Ala.Code 1975, § 35–4–90, the proper recordation of an instrument constitutes conclusive notice to all the world of everything that appears from the face of the instrument." *Clay v. Walden Joint Venture,* 611 So.2d 254, 256 (Ala.1992). The following are the relevant Alabama statutes which provide for record notice:

Ala.Code 1975, § 35–4–51—What instruments admitted to record; filing as notice of contents; section cumulative.

Except as may be otherwise provided by the Uniform Commercial Code, all deeds, mortgages, deeds of trust, bills of sale, contracts or other documents purporting to convey any right, title, easement, or interest in any real estate or personal property and all assignments of mortgages, deeds of trust or other securities for debt or extension agreements with respect thereto, when executed in accordance with law, shall be admitted to record in the office of the probate judge of any county. Their filing for registration shall constitute notice of their contents.

This section shall not be construed as superseding or repealing any other laws effective in Alabama relative to the subject matter in this article, but shall be held and construed to be cumulative.

Ala.Code 1975, § 35–4–62—Conveyances recorded in county where property situated.

Conveyances of real property must be recorded in the county in which such property is situated.

Ala.Code 1975, § 35–4–63—Recording effective as notice of contents of conveyance.

The recording in the proper office of any conveyance of property or other instrument which may be legally admitted to record operates as a notice of the contents of such conveyance or instrument without any acknowledgment or probate thereof as required by law. Ala.Code § 35–4–90 Conveyances of real property generally.

(a) All conveyances of real property, deeds, mortgages, deeds of trust or instruments in the nature of mortgages to secure any debts are inoperative and void as to purchasers for a valuable consideration, mortgagees and judgment creditors without notice, unless the same have been recorded before the accrual of the right of such purchasers, mortgagees or judgment creditors.

(b) Subsection (a) of this section includes absolute conveyances of real property defeasible by a defeasance or other instrument, in which case such defeasance or instrument must be recorded, according to its character, within the time limited in subsection (a) of this section or it is void as to purchasers for a valuable consideration, mortgagees and judgment creditors of the original grantee without notice.

**15.** Assuming that delivery of the deed had in fact been made.

tained from HSP an interest in the property superior to Mr. Taylor's interest. In other words, *any purchaser of HSP's interest in the property would have been on notice of Mr. Taylor's prior interest, and therefore could not have been a bona fide purchaser of the property.*

The case of *Walker v. Wilson,* 469 So.2d 580 (Ala.1985) illustrates this point. In *Walker,* the Swindalls conveyed real property to Walker on August 5, 1968. Walker gave the Swindalls a purchase money mortgage in return. The deed was not recorded until April 5, 1972. The mortgage was not recorded until October 3, 1972. In the meantime, on May 2, 1970, Walker had executed a mortgage to SCDC to finance the purchase of aluminum siding. The mortgage to SCDC was recorded on May 25, 1970. SCDC assigned its mortgage to NAAC. Walker defaulted on the Swindalls' mortgage and the Swindalls foreclosed on November 8, 1972. Walker also defaulted on the SCDC/NAAC mortgage. NAAC foreclosed on the mortgage on January 3, 1973. On May 2, 1977, NAAC transferred the property back to Walker by quitclaim deed. The quitclaim deed was recorded on October 5, 1978. On September 17, 1982, the Swindalls conveyed title to the property to Wilson by warranty deed recorded the same day. Wilson filed suit to quiet title against Walker.

Walker argued that since the SCDC/NAAC mortgage was recorded before the Swindall mortgage, SCDC had no notice of the Swindall mortgage, and was a bona fide purchaser, and received clear title to the property, and that she in turn received clear title from NAAC, based on the general rule that one having notice of a previous interest in the land may purchase from a bona fide purchaser and receive clear title. The court found that NAAC was not a bona fide purchaser because the Swindalls, and not Walker, were the legal title holders of record on the date the SCDC/NAAC mortgage was executed, since the deed to Walker had not

yet been recorded, and SCDC was, therefore, on inquiry notice of the Swindalls' interest in the property. The court's opinion reads in part:

First, SCDC was not a bona fide mortgagee because it had constructive or inquiry notice of the mortgage Walker gave to the Swindalls. This is so because Walker did not record her deed from the Swindalls until April 5, 1972. Therefore, Swindall, not Walker, was the record title holder when Walker gave SCDC a mortgage. SCDC may not simply take Walker's word that she held title to the property, Dewyer v. Dover, 222 Ala. 543, 133 So. 581 (1931); rather SCDC is presumed to have examined the title records and knowledge of the contents of those records is imputed to it. J.H. Morris, Inc. v. Indian Hills, Inc., 282 Ala. 443, 212 So.2d 831 (1968). SCDC apparently did not search the title records, because, according to the stipulated facts, SCDC made no inquiry of Walker concerning any interest Swindall had in the property. Such a search is not required for notice to be presumed. "A grantee, including a mortgagee, has notice of what appears in the chain of title of his grantor or mortgagor." Bank of Hartford v. Buffalow, 217 Ala. 583, 584, 117 So. 183, 185 (1928).

Since SCDC did not qualify as a bona fide mortgagee under the Recording Act, NAAC, as assignee of SCDC, likewise is prohibited from such status. Therefore, Walker may not defeat the Swindalls' mortgage by claiming to be a purchaser from a bona fide mortgagee without notice.

469 So.2d at 582.

■ The principles relied on by the Supreme Court of Alabama in *Walker* control in this case. Until recordation of the deed, any purchaser from HSP would be on inquiry notice of Mr. Taylor's interest in the property, and could not, therefore, be a "bona fide purchaser." [16]

---

16. In *Sherrod v. Hollywood Holding Corp.,* 233 Ala. 557, 560, 173 So. 33 (1937), the Hollywood Holding Corporation (HHC) contracted to sell real property to Whitney. On December 31, 1931, HHC executed a warranty deed and Whitney executed a purchase money mortgage. The documents were placed into escrow with Drennen and were not delivered until January 21, 1932, the date the transaction was consummated. King obtained a mortgage on the property from Whitney on January 15, 1932. King foreclosed the mortgage and gave a foreclosure deed

On the issue of preferential transfer, the Court finds that there can be no bona fide purchaser from HSP who can acquire rights in the property which would be superior to those of Mr. Taylor. The transaction between Mr. Taylor and HSP, at whatever precise point in time it may be said to have occurred, was "perfected," as that term is defined in Section 547(e)(1)(A), in May 1992, when the original contract was executed and HSP moved onto the property, or in November 1992, when the second contract was signed and the note and mortgage were delivered, or sometime in between. HSP acquired rights in the property when it moved in as a vendee and at no point since could a bona fide purchaser from HSP, under Alabama law, have obtained an interest in the property which would be superior to the rights of Mr. Taylor in the property.[17] The transfer assailed by HSP, therefore, was made for purposes of Section 547(e)(2)(A) more than 90 days before the petition in the present bankruptcy case was filed and cannot be avoided as a preferential transfer.

## 2. ASSUMING THAT THE DEED WAS EFFECTIVE TO PASS MR. TAYLOR'S INTEREST TO HSP, RECORDATION OF THE DEED AND MORTGAGE AT THE SAME TIME WAS A CONTEMPORANEOUS EXCHANGE FOR NEW VALUE

Even if a bona fide purchaser could have obtained an interest in the property from HSP superior to that of Mr. Taylor within 90 days of bankruptcy, and assuming for purposes of argument that the deed signed by Mr. Taylor was effective to transfer Mr. Taylor's interest in the property to HSP, the recordation of the deed and mortgage constituted a contemporaneous ex-

---

to Sherrod on January 7, 1933. Sherrod then sought a claim of title superior to HHC's. The court held that HHC's claim to the property was superior to that of King, on the grounds that since HHC had record legal title to the property when the mortgage to King was made, King was on notice of HHC's interest in the property and could not, for that reason, become a bona fide purchaser from Whitney. The court gave the following explanation:

> While the deed and purchase-money mortgage were in the hands of the repository under the agreement of escrow, the grantee in the deed (grantor in the mortgage under which King and Sherrod hold) could not execute and deliver a conveyance to a third party and give such conveyance precedence over the purchase-money mortgage to the Hollywood Holding Corporation. As said by Mr. Tiffany, "as against such preexisting claims it is immaterial when he [the vendor] records his purchase money mortgage, since the prior claimant is not a subsequent purchaser within the protection of the recording laws." Volume 3, Tiffany on Real Property (2d Ed.) § 636, p. 2563. As the King mortgage was executed and assigned to him prior to the delivery of the deed to his mortgagor, the latter was not able to convey the land (to King) freed from complainant's mortgage. That is, the prior date of record of the mortgage to King did not affect the prior title to complainant as the owner and holder of the purchase-money mortgage which was still held in escrow with the warranty deed to King's grantor. Until delivery of the escrow, the failure or defect of the title of nondelivery (under the terms of the agreement of escrow) was known and chargeable to King, and he could not be a bona fide purchaser for a valu-

able consideration without notice within the protection of our statutes providing for the record of conveyances of real property. Such is the just result; no title had passed pending escrow which could be conveyed and recorded to affect the prior purchase-money mortgage. 233 Ala. at 560, 173 So. 33.

As vendor under his contract with HSP, Mr. Taylor had a lien on his interest in the property for the payment of the purchase price. *Stagg v. Van Sant*, 390 So.2d 620, 622 (Ala.1980); *Wingard v. Randall*, 269 Ala. 420, 425, 113 So.2d 674, 678 (1959). Because of the recordation of the lease agreement from the BIDB to Mr. Taylor, and the lack of any document of record showing a transfer of that interest to HSP, any transferee from HSP would have been on notice of Mr. Taylor's vendor's lien. Mr. Taylor's vendor's lien would, therefore, be superior to the claims of subsequent purchasers.

17. "Where the owner executes a conveyance of lands, and deposits the same with an agent to be delivered to the purchaser when he complies with the contract, and executes a mortgage back to secure the unpaid purchase money, such instruments become operative only from the date of delivery; title remains in the vendor until such delivery and *eo instanti* returns to him by the mortgage so as to preclude the interposition of any title or right in any other person. . . ." *Sherrod v. Hollywood Holding Corp.*, 233 Ala. 557, 559, 173 So. 33 (1937), *quoting, McRae v. Newman*, 58 Ala. 529 (1877). Since the deed was invalid, Mr. Taylor has not yet conveyed his interest in the property to HSP, and since HSP does not own Mr. Taylor's interest in the property, it cannot convey an interest in the property that is superior to that of Mr. Taylor's.

change for new value and therefore is specifically exempt from avoidance as a preferential transfer by Section 547(c)(1)(A). HSP contends that the transfer took place when the mortgage document was recorded by Ms. Hawkins. Until that point, the deed had been neither delivered nor recorded. The delivery of the mortgage without the delivery of the deed was of no legal effect, since HSP could not mortgage that which it did not have, and by virtue of the mortgage, until delivery of the deed, HSP acquired no right to the property greater than that which it already had as a vendee in possession, and conversely, Mr. Taylor was divested of no greater rights in the property than he already had given up as vendor under the contract for sale. Until delivery of the deed, the mortgage was in law a nullity. Delivery of the deed (if it in fact had occurred) by virtue of its having been recorded in the probate office, as argued by HSP, breathed life into an otherwise lifeless document. Consequently, since the mortgage became valid and effective only at the same moment that the deed became valid and effective (if it in fact had become valid and effective), the exchange of the two instruments can be said to have occurred only at the moment both had been recorded, and by virtue of that fact, the exchange was "contemporaneous." Also, since the mortgage became valid and effective only because the deed became valid and effective (if it in fact had become valid and effective), the deed represented "new value" for the mortgage. The contemporaneous ex-

change of the deed for the mortgage, which to that point was worthless, constituted a "contemporaneous exchange for new value" and cannot be avoided as a preferential transfer. *Waldschmidt v. Mid–State Homes, Inc. (In re Pitman)*, 843 F.2d 235, 241 (6th Cir.1988).

## B. COVENANT ISSUES

### 1. NO COVENANTS WERE MADE BECAUSE THE DEED WAS NOT PROPERLY ACKNOWLEDGED AND IS THEREFORE INVALID

■ As stated above, HSP contends that:

By giving HSP a fee simple warranty deed, Mr. and Mrs. Taylor covenanted that they held fee simple title to the property and that the property was free of encumbrances, and that since the debt to AmSouth remains outstanding, Mr. and Mrs. Taylor have breached covenants of title and against encumbrances and must therefore pay damages to HSP.

■ Under Alabama law, the execution of any conveyance for the alienation of land must be attested by a witness or acknowledged before a person statutorily authorized to take acknowledgements.[18] A notary public may take such an acknowledgement.[19] But where such does not occur, an instrument which purports to be a conveyance for the alienation of land, if not attested

---

**18.** Ala.Code 1975, §§ 35–4–20 and 35–4–23 require a deed to be either attested or acknowledged:

§ 35–4–20—Conveyance required to be in writing; signature; attestation by witnesses.
Conveyances for the alienation of lands must be written or printed, or partly written and partly printed, on parchment or paper, and must be signed at their foot by the contracting party or his agent having a written authority; or, if he is not able to sign his name, then his name must be written for him, with the words "his mark" written against the same, or over it; the execution of such conveyance must be attested by one witness or, where the party cannot write, by two witnesses who are able to write and who must write their names as witnesses;
or, if he can write his name but does not do so and his name is written for him by another, then

the execution must be attested by two witnesses who can and do write their names.
§ 35–4–23—Acknowledgment—Operates as compliance with witness requirements.
The acknowledgment provided for in this article operates as a compliance with the requisitions of section 35–4–20 upon the subject of witnesses.

**19.** Ala.Code 1975, § 35–4–24 is entitled "Acknowledgment—Officers authorized to take in this state," and provides as follows:

Acknowledgments and proofs of conveyances may be taken by the following officers within this state: Judges of the supreme court, the court of civil appeals, the court of criminal appeals, circuit courts and district courts, and the clerks of such courts; registers of the circuit court, judges of the court of probate, and notaries public.

by a witness or properly acknowledged, is inoperative as a conveyance.[20]

■ For an acknowledgement to be effective, the persons signing the instrument must have appeared before the notary and acknowledged that they signed the instrument. *Central Bank of the South v. Dinsmore*, 475 So.2d 842, 845 (Ala.1985). In this case, Mr. Davis took the acknowledgement of Mr. and Mrs. Taylor's signature in his capacity as a notary public. Both Mr. Taylor and Mr. Davis testified that Mr. Davis mailed the deed to the Taylors in blank, that the Taylors signed the deed and returned it to Mr. Davis, who thereafter notarized the deed, and that Mr. Davis was not present when the deed was signed by the Taylors. HSP offered no evidence to the contrary. Because execution of the conveyance did not take place in the presence of Mr. Davis, the acknowledgement was invalid. *Central Bank of the South v. Dinsmore*, 475 So.2d at 845, 846. Since the deed was not attested by a witness or properly acknowledged, it is invalid, and inoperative as a conveyance of the Taylors' interest in the property to HSP. Because the deed is invalid, it cannot form the basis of an action for the breach of real property covenants which allegedly arose by virtue of the deed. *Drake v. Nunn*, 210 Ala. 136, 136, 97 So. 211 (1923).

## 2. NO COVENANTS WERE MADE BECAUSE THE DEED WAS NEVER DELIVERED

■ A deed, under Alabama law, is invalid until it is delivered to the grantee.[21] Whether a deed has been delivered is a question of fact and depends entirely on the manifest intention of the grantor, which must be determined from circumstances surrounding the transaction.[22] For there to be delivery, the grantor must intend for the deed to become presently effective and intend for his interest in the property to pass to the grantee.[23]

■ No particular formalities, words or acts on the part of the grantor are required and it is not essential that the deed be passed to the grantee in person.[24] Where the issue has been considered however, some parameters have been recognized. There is no delivery when the deed is merely given to a third party for safekeeping.[25] If the deed

20. *Constantine v. United States Fidelity and Guaranty Co.*, 545 So.2d 750, 755 (Ala.1989); *Central Bank of the South v. Dinsmore*, 475 So.2d 842, 846 (Ala.1985); *Lavender v. Ball*, 267 Ala. 104, 106, 100 So.2d 331, 332 (1958); *Golden v. Golden*, 256 Ala. 187, 191, 54 So.2d 460, 463 (1951). However, if "a deed purports to convey a title to real estate, is signed by grantor and delivered but not witnessed or acknowledged as required by law, it is in legal effect an agreement to execute an instrument passing legal title though it is inoperative itself to pass legal title." *Golden v. Golden*, 256 Ala. at 191, 54 So.2d at 463. Of course, *that is the very relationship intended by Mr. Taylor and HSP in the first place*, a contract to convey title to the property once title is obtained from BIDB, so that an interpretation of the "deed" executed by Mr. Taylor as an agreement to convey legal title would be in accordance with the intent of the parties and would not dictate a result different from that reached by the Court in this case, even if the deed had been delivered by Mr. Taylor to HSP.

21. *Chaney v. Waddell*, 624 So.2d 545, 546 (Ala. 1993); *Chandler v. Chandler*, 409 So.2d 780, 781 (Ala.1981); *West v. West*, 620 So.2d 640, 642 (Ala.1993); *Henslee v. Henslee*, 263 Ala. 287, 289, 82 So.2d 222, 224 (1955); *Robinette v. Tidwell*, 261 Ala. 538, 541, 75 So.2d 138, 140 (1954); *Hinson v. Byrd*, 259 Ala. 459, 464, 66 So.2d 736, 739 (1953); *Pittman v. Pittman*, 247 Ala. 458,

461, 25 So.2d 26, 28 (1945); *Gandy v. Hagler*, 245 Ala. 167, 172, 16 So.2d 305 (1944); *Powell v. Powell*, 217 Ala. 287, 288–289, 116 So. 139 (1928).

22. *Chaney v. Waddell*, 624 So.2d 545, 546 (Ala. 1993); *West v. West*, 620 So.2d 640, 642 (Ala. 1993); *Chandler v. Chandler*, 409 So.2d 780, 782 (Ala.1981); *Robinette v. Tidwell*, 261 Ala. 538, 541, 75 So.2d 138, 140 (1954); *Hinson v. Byrd*, 259 Ala. 459, 464, 66 So.2d 736, 739 (1953); *Pittman v. Pittman*, 247 Ala. 458, 461, 25 So.2d 26, 28 (1945); *Powell v. Powell*, 217 Ala. 287, 288–289, 116 So. 139 (1928). "The intention of the grantor is 'of paramount importance' in determining whether a deed has been delivered." *West v. West*, 620 So.2d at 642.

23. *Chaney v. Waddell*, 624 So.2d 545, 546 (Ala. 1993); *Chandler v. Chandler*, 409 So.2d 780, 781 (Ala.1981); *Hinson v. Byrd*, 259 Ala. 459, 464, 66 So.2d 736, 739 (1953); *Pittman v. Pittman*, 247 Ala. 458, 461, 25 So.2d 26, 28 (1945).

24. *Chandler v. Chandler*, 409 So.2d 780, 781 (Ala. 1981); *Hinson v. Byrd*, 259 Ala. 459, 464, 66 So.2d 736, 739 (1953).

25. *Chandler v. Chandler*, 409 So.2d 780, 781 (Ala. 1981); *Pittman v. Pittman*, 247 Ala. 458, 461, 25 So.2d 26, 28 (1945). "The mere deposit of a

is subject to be recalled by the grantor before delivery to the grantee, there is no delivery.[26] The law does not presume that when a deed is handed to a third person, it has been done so with the intention to pass title to the grantee.[27] For such an act to constitute delivery to the grantee, the intention of the grantor must be expressed at the time in an unmistakable manner.[28] "The mere deposit of a writing complete in other respects as a deed with a person other than the one named as grantee or his agent, when unaccompanied with any intention of passing title, is not a delivery such as is necessary to constitute a deed." *Pittman v. Pittman*, 247 Ala. 458, 461, 25 So.2d 26, 28 (1945).

■■■■ Recordation of a deed is prima facie evidence of delivery.[29] That evidence, of course, may be rebutted by proof tending to show that in fact no delivery was intended.[30] The mere undisclosed intention of the grantor not to deliver at the time he causes a deed to be filed for record, without surrounding facts or circumstances in support of that intention, is insufficient to overcome the prima facie showing of delivery of the deed.[31] While retention of the deed by the grantor after it is recorded may not alone be sufficient to overcome the presumption that the deed was delivered, it is to be considered together with other relevant facts, circumstances and declarations.[32]

■■■■ Neither HSP, Mr. Wells nor Mr. Harris ever received a deed to the property from either Mr. Taylor, Mrs. Taylor, Mr. Davis or Ms. Hawkins, or from anyone acting in the employ of, or under the direction or control of Mr. and Mrs. Taylor. HSP bases its contention that the deed was delivered on the fact that Ms. Hawkins filed the deed for record in the office of the probate court of Jefferson County, Alabama. A myriad of facts, circumstances, events and declarations which attended the dealings between the parties, however, leads this court inexorably to

---

writing complete in other respects as a deed with a person other than the one named as grantee or his agent, when unaccompanied with any intention of passing title, is not a delivery such as is necessary to constitute a deed." *Pittman v. Pittman*, 247 Ala. at 461, 25 So.2d at 28.

**26.** *Chandler v. Chandler*, 409 So.2d 780, 781 (Ala. 1981); *Pittman v. Pittman*, 247 Ala. 458, 461, 25 So.2d 26, 28 (1945). As stated by the Alabama Supreme Court in the *Chandler* case:

The delivery must be so effectual as to deprive the grantor of the right to revoke it. For so long as he reserves to himself the locus penitentiae, there is no delivery—no present intention to divest himself of the title to the property.... The grantor need not expressly reserve to himself this right to repent, but if his act upon which a delivery is predicated does not place the deed beyond his control, as a matter of law, then his *right of revocation is not gone.* *Chandler v. Chandler*, 409 So.2d at 781 (quoting *Fitzpatrick v. Brigman*, 130 Ala. 450, 30 So. 500 (1900)).

**27.** *Chandler v. Chandler*, 409 So.2d 780, 781 (Ala. 1981); *Pittman v. Pittman*, 247 Ala. 458, 461, 25 So.2d 26, 28 (1945).

**28.** *Chandler v. Chandler*, 409 So.2d 780, 781 (Ala. 1981); *Pittman v. Pittman*, 247 Ala. 458, 461, 25 So.2d 26, 28 (1945).

**29.** *Henslee v. Henslee*, 263 Ala. 287, 290, 82 So.2d 222, 226 (1955); *Robinette v. Tidwell*, 261 Ala. 538, 541, 75 So.2d 138, 140 (1954); *Gandy v. Hagler*, 245 Ala. 167, 172, 16 So.2d 305 (1944);

*Powell v. Powell*, 217 Ala. 287, 288–289, 116 So. 139 (1928).

**30.** *Henslee v. Henslee*, 263 Ala. 287, 290, 82 So.2d 222, 226 (1955); *Robinette v. Tidwell*, 261 Ala. 538, 541, 75 So.2d 138, 140 (1954); *Pittman v. Pittman*, 247 Ala. 458, 461, 25 So.2d 26, 28 (1945); *Powell v. Powell*, 217 Ala. 287, 288–289, 116 So. 139 (1928). See, e.g., *West v. West*, 620 So.2d 640, 642 (Ala.1993) (where grantors executed a deed naming Jeff and Burliss as grantees, and recorded the deed with the probate court, but delivered deed to Burliss only, and told Burliss that Jeff's name was on the deed by mistake and later filed a deed of correction to delete Jeff's name as grantee from the deed, the deed was never delivered to Jeff and did not pass title to him); *Pittman v. Pittman*, 247 Ala. 458, 461, 25 So.2d 26, 28 (1945) (where grantor withdrew from transaction after executing deed to property, but while deed was *still* in possession of escrow agent, subsequent delivery of deed to grantee by deceased escrow agent's son twelve years later, and recordation of the deed by the grantee, was ineffectual to divest or pass title); *Gandy v. Hagler*, 245 Ala. 167, 172, 16 So.2d 305 (1944) (even though deed had been recorded, court found that deed had not been delivered and was invalid).

**31.** *Robinette v. Tidwell*, 261 Ala. 538, 541, 75 So.2d 138, 140 (1954).

**32.** *Robinette v. Tidwell*, 261 Ala. 538, 541, 75 So.2d 138, 140 (1954); *Powell v. Powell*, 217 Ala. 287, 288–289, 116 So. 139 (1928).

conclude that not only did Mr. Taylor not intend the deed to be delivered to HSP before the end of the term of the lease between Mr. Taylor and BIDB, and the concomitant expiration of the AmSouth bond indenture debt, but also that HSP and Mr. Wells did not expect to receive a deed to the property until that time.

No document signed by both parties other than the "Commercial/Industrial Sales Contract" quoted above purports to specify when Mr. Taylor is to transfer title to the property to HSP. That agreement expressly contemplates that Mr. Taylor will not convey title to the property to HSP until December 10, 1998, the date on which the lease term as provided for in his agreement with BIDB ends, and he can exercise his option to purchase the property from BIDB, unless HSP elects to refinance or otherwise pay off its obligation to Mr. Taylor before that date. In the latter event, the contract requires Mr. Taylor immediately to pay off AmSouth and transfer title to HSP. Otherwise, the contract envisions that title will not be transferred from Mr. Taylor to HSP until the end of the lease term and that monthly payments made by HSP to Mr. Taylor will be used by him to satisfy the monthly payments under the lease. If that were not the understanding, the provision of the contract which specifically reserves to Mr. Taylor (the "Seller") the "right to refinance or repay the bond issue, subject of the AmSouth Bank loan *at his discretion*," would be entirely redundant, as would be the provision which empowers HSP to prepay the debt to Mr. Taylor, and upon prepayment of the debt to Mr. Taylor, requires him to "pay AmSouth Bank, N.A., in full, its obligation to AmSouth Bank, N.A., and transfer free and clear title to Health Science Products, Inc." Paragraph 2 of "Exhibit A" to Def. Ex. 19 (emphasis added).

Other provisions of the contract support this conclusion. For instance, under the contract, the Seller agrees to transfer title subject, among other things, to taxes for the years 1998 and beyond, even though the contract was executed in 1992. Furthermore, although Mr. Taylor has the right under the contract to refinance the AmSouth bond debt, he must, under the terms of the contract, assure that HSP incurs no property taxes for years prior to 1998. Those two provisions are aversions to the fact that while the bond issue is unpaid, the property is not taxable, and consequently HSP will owe no property taxes. The converse is that the bond issue is paid, the property will no longer be tax exempt, and whoever holds title at that point, will be liable for property taxes. The contract is designed, therefore, for HSP not to take legal title until December 1998, and thereby avoid the payment of property taxes during the interceding six years. The provision of the contract which specifies that "late charges shall accrue to the purchaser pursuant to late charges from AmSouth Bank as assessed to the Seller," (Paragraph 2 of "Exhibit A" to Def. Ex. 19) is indicative of the parties' understanding that Mr. Taylor would use the payments received from HSP to make the monthly payments on the lease. A similar provision is included in HSP's promissory note, which provides that, in the event payments are not timely made by HSP, "a late charge equal to any late charges assessed Holder by AmSouth Bank, N.A. will be assessed against Borrower." Paragraph 2 of Def. Ex. 19. Thus, the provision of the contract allowing Mr. Taylor to refinance and pay off the AmSouth debt "at his discretion," the provisions allowing HSP to prepay its debt to Mr. Taylor and requiring Mr. Taylor to payoff AmSouth and transfer title in the event of prepayment, the provisions relating to property tax exemptions, and the late charge provisions contained in both the contract and the note, directly contradict HSP's present contention that Mr. Taylor was either expected or required under the agreement to pay off AmSouth and transfer legal title to HSP in November 1992, or for that matter, at any point prior to December 1998.[33]

---

**33.** The only other provision in the document which purports to discuss the date title is to pass is that provision which refers to a "closing date." That closing date of May 1, 1992, had long passed before the contract was drafted and executed, and long before the note, mortgage and deed were executed. Logically, a closing can take place only after all required documents are executed and ready to exchange, and customarily that is when a closing takes place in the common

The intentions of the parties expressed in the "Commercial/Industrial Sales Contract" and the promissory note, that title will not be transferred from Mr. Taylor to HSP until the end of the lease term and that monthly payments made by HSP to Mr. Taylor will be used by him to satisfy the monthly payments under the lease, are the same as those exhibited in the offers and counteroffers exchanged by the parties prior to May 1, 1992, and the initial "Purchase Agreement" signed by both parties at the meeting had on that date. The initial offer made by Mr. Wells in the spring of 1992 provides that "Seller agrees that there is a balance payable to AmSouth Bank, N.A. (AmSouth) $452,354.61 at April 10, 1992, and seller may at his option pay off the existing bank mortgage or maintain the existing bank mortgage and HSP shall make payment monthly to the seller and the seller agrees to pay monthly to AmSouth, as per the existing terms of the current loan agreement with AmSouth and IDB—the tax exempt revenue bond," and that "[u]pon payoff of the existing mortgage to AmSouth, title shall be transferred free and clear to Health Science Products, Inc. when sellers purchase option-mortgage contract has been paid in full by HSP." Def. Ex. 29. Mr. Taylor's counteroffer to Mr. Wells's offer likewise provided that "[u]pon payoff of the existing mortgage to AmSouth Bank or to the seller, title shall be transferred free and clear to HSP, Inc." Def. Ex. 5. The May 1 "Purchase Agreement" contains a provision allowing HSP to prepay its debt to Mr. Taylor and requiring Mr. Taylor to pay off AmSouth and transfer title in the event of prepayment which is identical to that contained in the "Commercial/Industrial Sales Contract" and also provides: "Seller has an IDB and there is no property tax payable until December 10, 1998. Purchaser agrees to assume and pay all property tax assessments after December 10, 1998." Def. Ex. 7.

The activities of the parties and their attorneys following the May 1 meeting further bolster this Court's determination that Mr. Taylor did not intend to deliver the deed to the property to HSP before December 10, 1998. When Mr. Harris mailed the deed that he had drafted to Mr. Davis, he suggested that after Mr. and Mrs. Taylor executed the document, "we will keep it on file without the necessity of recording same." Def. Ex. 14. Mr. Davis then mailed the deed to Mr. Taylor with a letter requesting that Mr. and Mrs. Taylor sign the deed and return it to him, and indicating that upon his receipt of the signed deed, he would "delivery (sic) all of the documents to Mr. Wells' attorney for him to keep, in his file." Def. Ex. 15. Simultaneously, Mr. Davis wrote Mr. Harris a letter in which he indicated that he had forwarded the deed to Mr. and Mrs. Taylor for their signatures, and that upon his receiving the deed back from them, he would "send it over to you [referring to Mr. Harris] for safe-keeping." Def. Ex. 16 (parenthetical added). Upon receipt of the letter from Mr. Davis, and the copy of the letter from Mr. Davis to Mr. Harris, Mr. Taylor called Mr. Davis and demanded that the deed to the property not be delivered to either HSP or Mr. Harris. Mr. Davis advised Mr. Taylor that he would comply with his directions and proceeded to retain the deed until delivering it as part of his file to Ms. Hawkins almost two years later. Later, on October 9, 1992, Mr. Davis sent a letter to Mr. Harris requesting the mortgage and note to be signed by Mr. Wells, and indicating that after the documents were signed, he and Mr. Harris could "coordinate things on the holding of the original documents." Def. Ex. 17.

Both Mr. Davis and Mr. Harris testified that, according to their understanding, Mr. Taylor had no obligation to deliver the deed to the property until the AmSouth debt was paid, that he had no obligation to extinguish

order of real estate transactions. Reference in the contract to a closing date which had already passed is nonsensical and can form no basis for deciding when the parties intended for title to be transferred. The following excerpt from Mr. Davis's testimony lends emphasis to this point:

Q. It says: "The time of the closing shall be the first day of May or on the date, if any, to which such time is extended." Was there ever a closing of where documents were sat down and exchanged for the deed or mortgage?
A. No, it was not.
Q. Did you ever have any agreement of any date for a closing in that sense?
A. No, we did not.
Transcript at 56.

the AmSouth debt until the end of the lease, and that the deed was supposed to remain in Mr. Davis's file until then, and was to be neither recorded nor physically delivered to HSP in the meantime.[34] Mr. Wells's testi-

34. The following excerpt of Mr. Davis's testimony relates to the discussions between the parties at the May 1 meeting:

Q. At that meeting [May 1, 1992 meeting], was there any discussion about when the seller, that is, Mr. Taylor, was to pay AmSouth and transfer the title free and clear?

A. Mr. Taylor was to transfer title upon full satisfaction of the bond issue that was in place with AmSouth bank.

Q. And was he to do that—was there any discussion as to when that was to be done in relation to when—

A. There was a discussion. It was discussed that Mr. Taylor could possibly obtain financing, refinance the project, the bond issue, refinance the bond issue, and pay it off. If that happened, then Mr. Taylor would then transfer title upon payment in full. If he did not refinance the bond issue, then he would not transfer title until the last payment was made under the bond issue, which, I believe, was 1998.

Q. Was there any discussion at that meeting about whether or not Mr. Taylor owned the property or was a lessee?

MR. RUBIN: I object to the continuous leading of the witness.

MR. CLEVELAND: I have to make some reference—

MR. RUBIN: That's all Mr. Cleveland is doing is leading the witness.

MR. CLEVELAND: I just asked him if there was a discussion about that topic.

THE COURT: I'll overrule it, but if you could—

MR. CLEVELAND: All right. I'll try not to, Judge.

THE COURT: —be less leading.

THE WITNESS: Should I answer?

THE COURT: Yes, thank you.

A. Yes, it was discussed. And Mr. Taylor did not own the property; he was a lessee under the bond issue. And I believe the title to the property was in the city of Birmingham's name.

Transcript at 27–28 (parenthetical added).

On cross examination, Mr. Davis further elaborated on the understanding between the parties as indicated by their conversations had at the May 1 meeting:

Q. So it was the intent, at least in your mind, from your discussions at those meetings, that if Mr. Taylor decided two days after the documents were executed to pay off AmSouth, he would convey title to Health Science, is that correct?

A. He would then get title at that point.

Q. He would have an obligation to convey title to Health Science; isn't that correct?

A. If he was paid by Health Science.

Q. I see.

THE COURT: This $600,000.00?

A. Whatever was owed to get the property at that time.

Transcript at 50–51.

In the following excerpt, Mr. Davis relates his conversation with Mr. Harris following the letter which is Defendant's Exhibit 13, that was sent by Mr. Harris to Mr. Davis regarding the title binder:

A. Mr. Taylor—we had discussed at what point a deed would be recorded from Mr. Taylor to HSP. And again, we got back to the situation where we had discussed if interest rates were to be—if it would be advantageous for Mr. Taylor to refinance the bond issue and go to a bank and pay off the bond issue. At that point, if HSP paid any balance that was due, then Mr. Taylor at that point would convey title to HSP. If he did not do that, then what would happen is: When Mr. Taylor—the bond issue, the lease under the bond issue provided that in 1998, after the term of the lease, Mr. Taylor could pay one dollar to the City and then he would—they would transfer title to the property to him. If it ran the full course of the lease, then Mr. Taylor would pay the dollar and, at that point, would convey title to HSP.

Transcript at 32–33.

The following excerpt from Mr. Davis's testimony explains his understanding with Mr. Harris regarding the disposition of the deed and the mortgage:

Q. Did you have any understanding with Mr. Harris as to what you were to do with the deed, or an agreement with Mr. Harris?

A. Just keep it in safekeeping.

Q. And did Mr. Harris send you a—later, a note and mortgage that he had prepared, or that had been prepared and was signed by his clients?

A. He did.

Q. And I'll show you Defendant' Exhibit 18. Is that the cover letter that he sent you?

A. Yes.

Q. Is Exhibit 11 the note that was included there?

A. Yes, sir.

Q. And Exhibit 13 was—

A. It was the mortgage.

Q. —the mortgage?

A. Yes, sir.

Q. Did you have any conversation about what you were to do with those with reference to recording?

MR. RUBIN: Conversation with whom?

MR. CLEVELAND: With Mr. Harris.

A. I did.

Q. And what was that conversation?

A. I was to hold them.

Transcript at 37–38.

On cross examination, Mr. Davis explained the import of that section of the "Commercial Industrial Sales Contract" which permits HSP to obtain title prior to December 1998 by paying off the bond indebtedness in full:

Q. (By Mr. Rubin) Can you point out to us any of the documents that either you or Mr. Harris prepared, any provision that says that title—conveyance of title from Taylor to Health Science Products is conditional on payment by Health Science Products to Taylor rather than Taylor paying off AmSouth?

A. Give me a second to look back through. I'm sorry. Would you repeat the question, please?

Q. Would you repeat the question?

(Whereupon the court reporter read back the last question)

Q. Do you understand the question, Mr. Davis?

A. I think I do. I'm looking at page 4—I don't know if this—of the Commercial Industrial Sales Contract where it says that Health Science Products has a right to refinance the remaining mortgage balance due and pay the seller the remaining principal balance. Seller agrees to pay AmSouth Bank in full its obligation to AmSouth Bank and transfer free and clear title to Health Science.

Q. Yes. But there's no provision in that document which requires title to pass based on the condition preceding of Health Science Products paying off Taylor. The condition precedent was Taylor paying off AmSouth; isn't that correct?

A. This says they can refinance it and pay off the remaining principal balance due in the very next sentence. It says that seller agrees to pay AmSouth Bank.

Transcript at 52–53.

Mr. Davis related his understanding with Mr. Harris that the deed was to be stored and was not to be delivered or recorded until December, 1998, when Mr. Taylor actually obtained title to the property:

Q. I believe he asked you in that letter [Defendant's Exhibit 18] he's enclosed—he says: "I trust the executed deed is on its way to me."

A. Uh-huh (positive response).

Q. Was that true? Was the deed on its way to him?

A. No.

Q. After this letter did you have any conversation about the deed to him?

A. Yes, we did.

Q. What was that conversation?

A. The conversation was that we would not be sending the deed and that the deed—as we had discussed before, none of the documents were to be recorded until at some point in the future when Mr. Taylor had title to the property.

Q. Did he agree to that?

A. Yes.

MR. RUBIN: Who is he?

A. Don Harris.

Q. (By Mr. Cleveland) Did he make any further effort after then to get the deed?

A. No, he did not.

Q. Mr. Wells or anyone ever asked you for the deed?

A. No.

THE COURT: What was the purpose of the deed, Mr. Davis?

A. I've been thinking back trying to recall why we signed the deed at that time, and I just can't recall why it was all done at that time, and maybe Mr. Harris will remember.

Transcript at 54–55 (parenthetical added).

The testimony of Mr. Harris on the subject of when title to the property was to be transferred does not contradict that of Mr. Davis:

Q. Now, I show you Defendant's Exhibit 14; is that a cover letter where you sent the deed to Mr. Davis?

A. Yes sir, it appears to be.

Q. And in that letter, you asked him to have that deed signed but that you would withhold recording?

A. That's correct, yes, sir.

Q. If you knew that Mr. Taylor did not have title but only was a lessee with an option to buy, what was the reason for preparing a deed at that time?

A. It was my understanding when we entered into this agreement that the contingency of the lease was to be removed at some point. There was going to be a transfer made right away subject to the removal.

THE COURT: The lease you are referring to is the one between Mr. Taylor and the Industrial Development Board?

A. Yes, Your Honor. Mr. Cleveland, as I recall, there was even—there was some sort of factor built in whereby it could be paid off even earlier to expedite the process. I think Mr.—HSP, I believe, could have gone and done that or whatever. Hopefully, I'm answering your question.

Q. Do you recall any discussions that the deed was not to be delivered until HSP had paid Mr. Taylor?

A. No. I think the execution of the deed was going to be delivery more or less. It was just a matter of—it was not going to be recorded until the contingency stated in the title policy was cleaned up.

Q. And then—

THE COURT: What contingency are you referring to?

A. We're talking about—to me, Your Honor?

THE COURT: Yes.

A. The fact that the Industrial Development Board had title to the property according to the title policy.

THE COURT: Which has nothing to do with that UCC transfer statement that was attached to the letter?

MR. CLEVELAND: I don't think so, Judge.

Q. Did you have any discussion—was it your understanding that Mr. Taylor was to not pay off the Industrial Development Board until he got paid?

A. It was my understanding that he was going to continue paying and pay off the Industrial Development Board.

Q. In the monthly installments?

A. That may have been the plan. Mr. Wells and Mr. Taylor—

mony does not address any of those subjects, and consequently does not tend to contradict the testimony of either Mr. Davis or Mr. Harris.

Other than the rebuttable presumption raised by virtue of Ms. Hawkins recording the deed, the stipulation made by the parties regarding the expected substance of Ms. Hawkins testimony is inconclusive. The stipulation is sketchy and leaves many questions unanswered. Whether Ms. Hawkins discussed recordation of the documents with Mr. Taylor before doing so and whether the recording fees were billed or paid before or after recordation of the documents was not covered in the stipulation. This Court can only speculate as to Ms. Hawkins' reasons for recording the documents, or for advising Mr. Taylor to record the documents, whichever the case may be. It may be that she believed that recording the documents was a necessary prerequisite to the foreclosure process. It may be that Ms. Hawkins did not know the nature or condition of the title to the property, or the respective positions of the BIDB and AmSouth and the Taylors and HSP as to that title. It may be that she believed that she was faced with a simple land purchase money transaction and believed in good faith that recordation of the documents was necessary, or at least advisable, for the protection of her client's interests, and as a foundation for a valid foreclosure sale. Undoubtedly, the fact that the deed was retained by Ms. Hawkins and Mr. Taylor following its recordation, and was never physically delivered to Mr. Wells or HSP, tends to materially undermine the presumption that recordation was intended to effect delivery, as does Mr. Taylor's clear testimony that he never authorized or directed anyone to deliver the deed to either HSP or Mr. Wells or Mr. Harris.

In any event, the stipulation as to Ms. Hawkins's testimony is insufficient to overcome what this Court considers to be over-

MR. RUBIN: Wait a minute. Let the—I object. The witness hasn't finished answering the question.
A. That may have been the arrangement that was worked out between them. I don't recall what the payments to the Industrial Development Board were in light of this document, Defendant's Exhibit No. 7. As I said, I just don't recall the Industrial Development Board being anything more than just, more or less—if you want to call it a cloud on title, or something to that effect.
Q. (By Mr. Cleveland) But was there any discussion that you had with Mr. Davis or with Mr. Taylor about Mr. Taylor paying off the Industrial Development Board before he got his money from Health Science Products?
A. Mr. Cleveland, I don't recall having a conversation to that effect.
Transcript at 64–68.

Nor does Mr. Harris's testimony contradict Mr. Davis's rendition of the understanding between the two regarding the expected disposition of the deed and mortgage:
Q. In the letter of November 11, which is Defendant's Exhibit 18, you make the statement there to Mr. Davis, you say: "I trust the executed deed is on its way to you."
A. Uh-huh (positive response).
Q. Did you ever receive the deed from Mr. Davis executed?
A. No. My recollection is that I did not.
Q. Did you have any conversation with him after then about receiving the deed?
A. We talked about it at some point after that.
Q. Do you recall talking with him and him saying that the deed was not—that he was not going to deliver the deed until the payments were made and paid in full?
A. No, sir, I don't recall that.
MR. RUBIN: Would you answer that again? I didn't hear you Mr. Harris.
A. No, sir, I don't recall that.
MR. RUBIN: Thank you.
Q. (By Mr. Cleveland) Is your answer that you just don't recall it, or do you—
A. I don't recall having any conversation to the effect that the deed was not going to be delivered or whatever.
Q. Did you make any effort, then, to get the deed?
A. It was my understanding, subsequent to that, that the deed—in a conversation with Rick—the deed had been executed and that the deed would remain with the mortgage and all the paperwork that was there.
Q. Remain with Rick?
A. That's correct.
Q. That's all I have.
Transcript at 70–72.
Q. Was the deed ever delivered to your knowledge?
A. The deed was executed. I was told—
Q. Was it delivered to your knowledge?
A. My function is the execution of that deed with the understanding that Rick would retain that deed.
Q. Was it ever physically given to you?
A. No. It wasn't supposed to be.
Q. Was it ever physically given to Mr. Wells to your knowledge?
A. I don't believe it was supposed to be.
Transcript at 74.

whelming evidence that Mr. Taylor did not intend to deliver the deed to Mr. Wells or HSP, and does not intend to provide a deed to Mr. Wells or HSP earlier than the end of the lease term, unless HSP prepays the purchase debt to Mr. Taylor before then. In addition, there is a complete lack of testimony or evidence demonstrating an intent on the part of Mr. Taylor to deliver the deed. Certainly the actions of Mr. Wells following November 1992, or more appropriately, the lack thereof, cannot be considered characteristic of someone who expected to receive a deed to the property or who was aggrieved by Mr. Taylor's failure to provide a deed. Despite the fact that, because of payment difficulties and defaults, Mr. Taylor was communicating with Mr. Wells on at least a monthly basis for a period of almost two years, Mr. Wells apparently never once inquired of Mr. Taylor regarding the deed. The following excerpt from Mr. Wells' testimony makes the point:

> Q. I want to show you Plaintiff's Exhibit 1, which is a copy of the deed. And I'll ask you if prior to this lawsuit, had you ever seen that deed before?
>
> A. No, sir.
>
> Q. Anybody ever deliver it to you or hand it to you?
>
> A. No, sir.
>
> Q. Did you ever ask anybody about the deed?
>
> A. No, sir. I had asked earlier from Mr. Harris was everything taken care of, and I'm going to guess that was close to eight or nine months prior to this, maybe a year—closer to a year.

Transcript at 121.

Based on the uncontradicted testimony of Mr. Taylor, Mr. Davis, and Mr. Harris, the language of the documents admitted into evidence, the lack of concern exhibited by Mr. Wells following November 1992, the fact that

the deed was retained by Ms. Hawkins and Mr. Taylor following its recordation, and the fact that the deed has never been physically delivered, this Court finds that the presumption of delivery raised by the recording of the deed has been adequately rebutted. Because the evidence is that Mr. and Mrs. Taylor did not intend to deliver the deed, the deed was in fact never delivered, and, therefore is of no legal effect or validity. Since the deed is invalid, it cannot form the basis of an action for the breach of real property covenants which allegedly arose by virtue of the deed. *Drake v. Nunn,* 210 Ala. 136, 136, 97 So. 211 (1923).

### 3. ASSUMING THAT THE DEED WAS VALID, HSP WOULD BE ENTITLED ONLY TO NOMINAL DAMAGES FOR BREACH OF COVENANT

 Had the general warranty deed signed by Mr. and Mrs. Taylor, which clearly purports to convey a fee simple interest in the property to HSP, been properly acknowledged and delivered, the covenants contained in the deed, if breached, could have been made the basis of causes of action by HSP against Mr. and Mrs. Taylor for the breach of those covenants. A "general warranty deed" in the state of Alabama is a deed which contains the following five covenants made by the grantor to the grantee: (1) a covenant to warrant and defend the title to the real estate; (2) a covenant to insure the grantee's quiet enjoyment of the real estate; (3) a covenant of seisin; (4) a covenant of good right to convey; and (5) a covenant against encumbrances.[35] The first two covenants, the covenants of title and quiet enjoyment, are virtually identical in operation and are only breached if and when the covenantee suffers actual or constructive eviction from the property by someone claiming paramount title.[36] Since the testimony in this case indi-

---

**35.** *St. Paul Title Insurance Corporation v. Owen,* 452 So.2d 482, 484 (Ala.1984); *Colonial Capital Corp. v. Smith,* 367 So.2d 490, 491 (Ala.Civ.App. 1979).

**36.** *Callon Institutional Royalty Investors I v. Dauphin Island Property Owners Association, Inc.,* 569 So.2d 343, 344 (Ala.1990); *St. Paul Title Insurance Corporation v. Owen,* 452 So.2d 482,

485 (Ala.1984); *Chicago, Mobile Dev. Co. v. G.C. Coggin Co.,* 259 Ala. 152, 66 So.2d 151, 155–156 (1953); *Wolff v. Woodruff,* 258 Ala. 1, 61 So.2d 69, 73 (1952); *Blaum v. May,* 245 Ala. 156, 158, 16 So.2d 329 (1944); *Keel v. Ikard,* 222 Ala. 617, 618, 133 So. 906 (1931); *Alger–Sullivan Lumber Co. v. Union Trust Co.,* 218 Ala. 448, 451, 118 So. 760 (1928); *Dothan Nat'l Bank v. Hollis,* 212 Ala. 628, 629, 103 So. 589 (1925); *Dallas Compress*

cates that HSP remains in peaceful possession of the property, and has not been evicted from the property, and is not in the process of being evicted from the property by someone claiming paramount title, HSP would presently have no cause of action based upon either of those warranties, even if the deed was valid.

 The covenants of seisin and of good right to convey are basically one in the same and mean that the grantor owns the estate which he proposes to convey.[37] Both are broken the moment the conveyance takes place if the grantor does not in fact own the estate which he proposes to convey.[38] However, the covenantee is entitled only to nominal damages for the technical breach of covenants of seisin and of good right to convey, as long as the covenantee's possession of the property is undisturbed by a third party with

paramount title.[39] Once again, since HSP has not been and is not being ousted from the property by a third party with paramount title, no more than nominal damages could be awarded for the technical breach of the covenants, even if the deed was valid.

 The covenant against encumbrances is, like the covenant of seisin, a covenant *in praesenti* which is broken the moment the conveyance takes place if there then exists an outstanding prior encumbrance.[40] The breach, is, however, merely technical, and will justify only an award of nominal damages, unless the covenantee has removed the encumbrance, the covenantee's possession has been disturbed, or the covenantee's use and enjoyment of the land has otherwise been interfered with by reason of the encumbrance.[41] The explanation for that

Co. v. Liepold, 205 Ala. 562, 565–566, 88 So. 681 (1921); *Thompson v. Flack–Haney Timber Co.*, 567 So.2d 345, 347 (Ala.Civ.App.1990); *Lacks v. Stribling*, 406 So.2d 926, 929 (Ala.Civ.App.1981); *Colonial Capital Corp. v. Smith*, 367 So.2d 490, 491 (Ala.Civ.App.1979).

37. *Wolff v. Woodruff*, 258 Ala. 1, 61 So.2d 69, 73 (1952); *Colonial Capital Corp. v. Smith*, 367 So.2d 490, 491 (Ala.Civ.App.1979).

38. *Lockhart v̌. Phenix City Investment Co.*, 488 So.2d 1353, 1356 (Ala.1986); *Colson v. Harden*, 224 Ala. 665, 666, 141 So. 639 (1932); *Alger–Sullivan Lumber Co. v. Union Trust Co.*, 218 Ala. 448, 451, 118 So. 760 (1928); *Bailey v. Levy*, 213 Ala. 80, 81, 104 So. 415 (1925); *Wolff v. Woodruff*, 258 Ala. 1, 61 So.2d 69, 73 (1952); *Colonial Capital Corp. v. Smith*, 367 So.2d 490, 491 (Ala.Civ.App.1979).

39. The covenant of seisin is broken as soon as made, and the covenantee's right of action therein complete, if the covenantor have not, at the time of the covenant, the title therein described. It is obvious, however, that if the covenantee remain in the undisturbed enjoyment and possession of the estate he has suffered no damage from the breach. Possibly he may never be disturbed in the possession, for the real owner may never assert his rights, or they may become barred by the statute of limitations. Accordingly, the rule has been established by numerous decisions that the covenantee can recover no more than nominal damages for a breach of the covenant of seisin, so long as he remains in the undisturbed possession of the estate.
*Alger–Sullivan Lumber Co. v. Union Trust Co.*, 218 Ala. 448, 451–452, 118 So. 760 (1928) (quoting Maupin on Marketable Title to Real Estate,

§ 116). In this case, it is clear that HSP's title will ripen into a fee simple no later than December, 1998. Until then, whether or not HSP has a fee simple in the property is irrelevant to HSP's use and enjoyment of the property. HSP is obligated to pay the debt to Mr. Taylor, regardless of the state of the title to the property.

40. *Lockhart v. Phenix City Investment Co.*, 488 So.2d 1353, 1356 (Ala.1986); *Chicago, Mobile Dev. Co. v. G.C. Coggin Co.*, 259 Ala. 152, 66 So.2d 151, 155 (1953); *Alexander v. Bond Bros.*, 232 Ala. 533, 536, 168 So. 561 (1936); *Colson v. Harden*, 224 Ala. 665, 666, 141 So. 639 (1932); *Bailey v. Levy*, 213 Ala. 80, 81, 104 So. 415 (1925); *Blankenship v. Lanier*, 212 Ala. 60, 60–61, 101 So. 763 (1924); *Smith v. Birmingham Realty Co.*, 208 Ala. 114, 116, 94 So. 117 (1922); *Colonial Capital Corp. v. Smith*, 367 So.2d 490, 492 (Ala.Civ.App.1979).

41. *Lockhart v. Phenix City Investment Co.*, 549 So.2d 48, 50 (Ala.1989); *Alger–Sullivan Lumber Co. v. Union Trust Co.*, 218 Ala. 448, 452, 118 So. 760 (1928); *Blankenship v. Lanier*, 212 Ala. 60, 62, 101 So. 763 (1924).

An exception to the general rule exists where a covenantee has suffered a breach of a covenant against encumbrances and the covenantor, after receiving part payment, forecloses the mortgage and bids in the property at an amount sufficient to cover the covenantee's indebtedness, but not the amount the covenantee had already paid on the purchase price of the property. *Lockhart v. Phenix City Investment Co.*, 549 So.2d 48, 50 (Ala.1989); *Smith v. Birmingham Realty Co.*, 208 Ala. 114, 117, 94 So. 117 (1922). Application of the general rule under those circumstances would not account for the loss which the covenantee incurred by reason of his or her payments

rule was pronounced by the Alabama Supreme Court in *Lockhart v. Phenix City Inv. Co.*, 549 So.2d 48 (Ala.1989):

> The rationale for this rule is that the covenantee may never be disturbed by the encumbrance constituting the breach, and the covenant against encumbrances is one of indemnity. Therefore, until the covenantee has been evicted by the encumbrance holder or has satisfied the encumbrance, there is nothing for which the covenantor can be called upon to indemnify the covenantee.

549 So.2d at 50. Since HSP has not paid the debt owed to AmSouth, and HSP's possession, use and enjoyment of the subject property has not been disturbed by reason of the encumbrance, only nominal damages could be awarded for the technical breach of the covenant, even if the deed was valid.

## C. NO EQUITABLE BASIS EXISTS FOR SUBORDINATING THE DEBT OWED TO MR. TAYLOR TO THE CLAIMS OF OTHER CREDITORS

HSP contends that the debt owed by HSP to Mr. and Mrs. Taylor should be equitably subordinated because of Mr. and Mrs. Taylor's purported inequitable conduct exhibited toward HSP by his not transferring clear title to the property. This Court finds, however, that Mr. Taylor engaged in no unfairness, overreaching, fraud or other inequitable conduct toward HSP during the course of the negotiations between the two or thereafter. Mr. Wells is an experienced businessman and was represented by an attorney. He knew the state of the title to the property when he entered into negotiations to acquire it. He knew that Mr. Taylor had only a leasehold and could not transfer title to the property until AmSouth was paid. He knew that Mr. Taylor anticipated using the funds received from HSP monthly to pay the note to AmSouth. He therefore knew that Mr. Taylor had no intention of transferring title

to the property before the debt to AmSouth was paid in December, 1998. HSP was not injured in the least as a result of any actions or omissions on the part of Mr. Taylor. To the contrary, HSP profited from the transaction, receiving an opportunity to purchase property over time which it could not pay for in cash, while paying no property taxes for six years or interest for three years, and benefitting from the accretion of value in the property in the meantime.

Proper exercise of the equitable subordination power can take place only where three elements are established: (1) the claimant must have engaged in some type of inequitable conduct, (2) the misconduct must have resulted in injury to the creditors or conferred an unfair advantage on the claimant, (3) subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Code. *In re Lemco Gypsum, Inc.*, 911 F.2d 1553, 1556 (11th Cir.1990). Since Mr. Taylor engaged in no inequitable conduct, and HSP was not injured as a result of any conduct on the part of Mr. Taylor, and Mr. Taylor received no unfair advantage over any other claimant as a result of his transaction with HSP, Mr. Taylor's claim may not be subordinated to other claims held by other parties against HSP.

## D. MR. TAYLOR DID NOT VIOLATE THE STAY AND NO DAMAGES HAVE RESULTED TO HSP AS A RESULT OF ANY VIOLATION OF THE STAY BY MR. TAYLOR

HSP alleges that Mr. Taylor violated the automatic stay provided for under 11 U.S.C. § 362 by engaging in the following activities:

> "On Saturday, August 27, 1994, Jim Taylor and approximately eight other individuals congregated at the loading dock of the Property for forty five minutes. Prior to Mr. Taylor's arrival, these individuals began looking into the building, and thereaf-

---

on the property nor negate the fact that, had the title been free of encumbrances, the property, at its unencumbered value, would have brought enough to reimburse the covenantee for those payments. *Smith v. Birmingham Realty Co.*, 208 Ala. 114, 117, 94 So. 117 (1922). The covenantee would be entitled to damages equal to

amounts actually paid to the covenantor toward the purchase price, but not the value of improvements made by the covenantee after the purchase, or consequential damages, or the reasonable value of the property at the time of foreclosure. *Lockhart v. Phenix City Investment Co.*, 549 So.2d 48, 51 (Ala.1989).

ter attempted to gain access to the building. One of the individuals represented to the Debtor that he was Mr. Taylor's agent."

"On Monday, August 29, 1994, a representative from the Fire Marshall's Office arrived at the Property. She indicated that Mr. Taylor had telephoned her office and told them that the plant on the Property was a fire hazard. The Fire Marshall representative toured the plant and with two minor exceptions which have been corrected (testing fire extinguisher and securing propane tanks to wall), she found no fire hazard."

"On September 6, 1994, the Chief Electrical Inspector from the City of Birmingham arrived at the plant indicating that Mr. Taylor had complained that the plant was improperly wired. The Debtor permitted the inspector to tour the Property. With the exception of minor exceptions regarding improving the building wiring, including rearranging certain machinery, the inspector found no significant wiring problems."

HSP's *Verified Second Amended Complaint,* Proceeding No. 12, filed September 7, 1994. Although Mr. Wells was called to testified, no inquiry was made of him regarding the foregoing allegations. No other employee of HSP was called to testify. None of the individuals who purportedly congregated at the plant testified, nor did anyone who witnessed the purported congregation and attempted entry. Neither the representative from the Fire Marshall's Office who allegedly toured the plant nor the Chief Electrical Inspector from the City of Birmingham was called to testify. In fact, no testimony was offered to support the allegations, except the following cross examination had of Mr. Taylor:

Question: When were you last inside the facility?

Mr. Taylor: Within the last thirty days.

Question: What was the occasion for you being there?

Mr. Taylor: I had tried to get insurance on the building because Mr. Wells had let the insurance expire and I had to take an insurance agent through the building to see about insuring the building.

Question: Did you also in the last ninety days call the fire inspector for the City of Birmingham and suggest that they go visit the building?

Mr. Taylor: Yes sir because the insurance agent wouldn't touch the building because it was a fire hazard.

Question: Did you also send someone from the electrical inspector's office to the building?

Mr. Taylor: Yes. They've added much wiring to the building without building permits or without authorized electricians.

Question: I ask you sir did you also arrive at the building one day with a group of people to show it to sell it?

Mr. Taylor: No sir. I had offered to drive by the building with some prospective clients from up north. They attempted to enter the building without my presence.[42]

In agreement with the Court's holding at trial, the Court finds that Mr. Taylor's testimony indicates clearly that he was not involved with the congregation of potential purchasers on the loading dock and the attempt to gain access to the building, and that he was not present when the incident occurred. This Court can find no basis for believing that the actions were taken in an effort to harass or coerce HSP, or to collect the debt owed by HSP to Mr. Taylor, or that the actions inconvenienced HSP or its efforts to reorganize in any manner. There being no additional testimony on the issues, this Court finds that the Taylors have not violated the stay, and that HSP has incurred no inconvenience or damage from any of the actions taken by Mr. Taylor in regards to the prospective purchasers, the electrical inspector, and the fire marshall. Since Section 362 prohibits Mr. Taylor, and all other creditors for that matter, from taking any action against HSP, or any property of the estate, no additional injunction against Mr. Taylor, as requested by HSP in its complaint, is necessary, and HSP's request for an injunction against Mr. Taylor must be denied.

42. The testimony quoted was transcribed from unofficial courtroom tape recordings.

## E. THE RELATIONSHIP BETWEEN HSP AND MR. TAYLOR

■ The obligation of Mr. Taylor under the contract is to deliver good title to the property to HSP on December 10, 1998. The obligation of HSP is to make the payments described in the promissory note which it executed in favor of Mr. Taylor. The contract encompasses both executory and nonexecutory elements.

Until December 10, 1998, the contract is executory, and Mr. Taylor's obligation to transfer legal title on that date is dependent on HSP's obligation to make the payments due under the contract before that date. In fact, the contract contemplates that Mr. Taylor will pay the remaining bond indebtedness with funds paid by HSP under the promissory note and sales contract. Mr. Taylor cannot pass title to the property until he actually acquires title to the property, by exercising the option to purchase provided for in the BIDB lease after satisfaction of the bond indebtedness. Indeed, any transfer of his interest in the property prior to satisfaction of the bond indebtedness, without the consent of all bondholders, would constitute a breach of the lease agreement between BIDB and Mr. Taylor.[43] Also, until the bond indebtedness is satisfied, Mr. Taylor remains obligated under the lease agreement, regardless of his arrangement with HSP, while HSP has no obligation to make payments under the lease agreement to BIDB.

The contract contemplates that Mr. Taylor will not satisfy the bond indebtedness and exercise the purchase option until December 10, 1998, unless HSP elects to prepay the purchase price owed to Mr. Taylor before that date. The benefits anticipated from the contract by Mr. Taylor were that he would eventually receive a profit from his investment and that in the meantime he would be relieved of the burden of making the monthly payments called for under his lease agreement with BIDB. The benefits anticipated from the contract by HSP were that it could pay for the property over time and that, until December 10, 1998, it would have no obligation to pay real estate taxes on the property. For those benefits to be realized, both parties have substantial and material obligations which remain to be performed. Mr. Taylor must deliver good title to HSP on December 10, 1998, and, in the meantime, make the monthly lease payments to BIDB. HSP must make the monthly payments due under its contract with Mr. Taylor so that Mr. Taylor can make the monthly lease payments to BIDB.

■ The contract contemplates that on December 10, 1998, Mr. Taylor will deliver a fee simple deed to HSP and that the portion of the purchase price then remaining unpaid will be secured by a purchase money mortgage on the property. HSP's obligation to make the payments due under the mortgage beyond that date is dependent on the transfer of legal title of the property from Mr. Taylor. As of that date, or any earlier date that HSP exercises its right to refinance the remaining balance due as provided in the Contract, the Debtor will have the right to require specific performance of the contract

---

**43.** The lease agreement between the Industrial Development Board of the City of Birmingham and Mr. Taylor provides as follows:

Section 6.07 *Encumbrances Created by User*
The User will not create or incur or suffer or permit to be created or incurred or to exist any mortgage, lien, charge or encumbrance on the Project or any part thereof without the prior written consent of the Holders of all Outstanding Bonds.

Section 6.09 *Assignment, etc. of Leasehold Interest*
The User may assign his rights under this Lease Agreement or mortgage his leasehold interest in the Project, or sublease the Project or any part thereof, subject to the following limitations:

(1) except for the sublease of the Project to the Corporate Guarantor, the User must obtain the prior written consent of the Holders of all Outstanding Bonds....

Def.Ex. 3.
Breach of the lease such as would result in termination of Mr. Taylor's interest in the property would in turn extinguish HSP's interest in the property. *Southwest Village Water Co., Inc. v. Fleming*, 442 So.2d 89, 91 (Ala.1983) (forfeiture of lease against lessee worked a forfeiture of rights of lessee's mortgagee in leased property); *U.S.A. Petroleum Corp. v. Jopat Building Corp.*, 343 So.2d 501, 504 (Ala.1977) (sublessee retained no rights in leased property upon forfeiture of the lease by the original lessee).

on the part of Mr. Taylor.[44] As of December 10, 1998, the contract will, therefore, be executory no longer, and will evolve into an ordinary mortgage relationship. Until that date, however, the contract is executory and must be treated in all respects as an executory contract under 11 U.S.C. § 365.[45]

**44.** Equity will not decree specific performance of a conveyance of land where the vendor has no title. *Enslen v. Allen*, 160 Ala. 529, 49 So. 430 (1909); *Fitzpatrick v. Featherstone*, 3 Ala. 40 (1841). Also, since the contract does not require legal title to be transferred before that date, HSP is not, until then, entitled to specific performance. *See e.g., Morris v. Bailey*, 261 Ala. 281, 283, 74 So.2d 447, 449 (1954) (where contract for sale of land provided that purchasers were not authorized or empowered to pay principal sum before due date, and installments payable under contract had not matured, purchasers were not entitled to specific performance); *Cary v. Grubbs*, 250 Ala. 4, 6, 32 So.2d 793, 795 (1947) (a provision of lease-sale contract for payment of balance of agreed principal amount of rent in monthly installments, with interest on each note, in advance, required payment of accrued interest on amount of each installment when paid, so that lessee was not entitled to specific performance of lessor's contract to convey land to lessee on her payment into court of merely difference between principal amount of deferred payments at time of filing bill and amount paid by lessee on principal and interest before such filing); *Bessemer Coal, Iron & Land Co. v. Bullard*, 215 Ala. 433, 434, 111 So. 5 (1927) (where contract for purchase of land calls for installment payments and all installments have not become due, purchaser is not entitled to specific performance).

**45.** This Court is aware of the divergent views which have been expressed on the subject of the status of land sales contracts in bankruptcy. In many circumstances, land sales contracts have been found to be executory contracts. *In re Frontier Properties, Inc.*, 979 F.2d 1358 (9th Cir. 1992); *In re Aslan*, 909 F.2d 367 (9th Cir.1990); *In re Terrell*, 892 F.2d 469 (6th Cir.1989); *Brown v. First Nat'l Bank in Lenox*, 844 F.2d 580 (8th Cir.1988); *In re Speck*, 798 F.2d 279 (8th Cir. 1986); *In re Cochise College Park, Inc.*, 703 F.2d 1339 (9th Cir.1983); *In re Rancho Chamberino, Inc.*, 89 B.R. 597 (W.D.Tex.1987); *In re Dunes Casino Hotel*, 63 B.R. 939 (D.N.J.1986); *In re Shaw*, 48 B.R. 857 (D.N.M.1985); *In re Von Keisler*, 166 B.R. 620 (Bankr.N.D.Tex.1994); *In re Churchill Properties VIII Ltd. Partnership*, 164 B.R. 607 (Bankr.N.D.Ill.1994); *In re Delex Management*, 155 B.R. 161 (Bankr.W.D.Mich.1993); *In re Seymour*, 144 B.R. 524 (Bankr.D.Kan. 1992); *In re Raby*, 139 B.R. 833 (Bankr. N.D.Ohio 1991); *In re Pogue*, 130 B.R. 297 (Bankr.E.D.Mo.1990); *In re Larsen*, 122 B.R. 733 (Bankr.D.S.D.1990); *In re Bellamah Community Development*, 107 B.R. 337 (Bankr.D.N.M.1989); *In re Coffman*, 104 B.R. 958 (Bankr.S.D.Ind. 1988); *In re Henke*, 84 B.R. 693 (Bankr.D.Mont. 1988); *In re Scanlan*, 80 B.R. 131 (Bankr. S.D.Iowa 1987); *In re W & L Associates, Inc.*, 71 B.R. 962 (Bankr.E.D.Pa.1987); *In re Buchert*, 69 B.R. 816 (Bankr.N.D.Ill.1987); *In re Waldron*, 65 B.R. 169 (Bankr.N.D.Tex.1986); *In re McCallen*, 49 B.R. 948 (Bankr.D.Or.1985); *In re Hawaii Daiichi–Kanko, Inc.*, 24 B.R. 163 (Bankr.D.Haw. 1982).

In other circumstances land sales contracts have been found to be nonexecutory contracts. *In re Heartline Farms, Inc.*, 934 F.2d 985 (8th Cir.1991); *In re Streets & Beard Farm Partnership*, 882 F.2d 233 (7th Cir.1989); *In re Frank Seitzinger Farms, Inc. of Iowa*, 67 B.R. 869 (D.S.D.1986); *In re Thurmond*, 46 B.R. 723 (D.Or.1985); *In re Adolphsen*, 38 B.R. 780 (D.Minn.1983); *In re McDaniel*, 89 B.R. 861 (Bankr.E.D.Wash.1988); *In re Eldorado, Inc.*, 85 B.R. 555 (Bankr.D.Mont.1987); *In re Fox*, 83 B.R. 290 (Bankr.E.D.Pa.1988); *In re Faiman*, 70 B.R. 74 (Bankr.D.N.D.1987); *In re Lemons & Associates, Inc.*, 67 B.R. 198 (Bankr.D.Nev. 1986); *In re Bertelsen*, 65 B.R. 654 (Bankr. C.D.Ill.1986); *In re Murtishi*, 55 B.R. 564 (Bankr.N.D.Ill.1985); *In re Jones*, 54 B.R. 697 (Bankr.E.D.Ark.1985); *In re Britton*, 43 B.R. 605 (Bankr.E.D.Mich.1984), *overruled by In re Terrell*, 892 F.2d 469 (6th Cir.1989); *In re Cox*, 28 B.R. 588 (Bankr.D.Idaho 1983). It should be noted that most of the cases cited can be distinguished in one respect or another from each other, and from the circumstances in the present case.

Resolution of the issue requires reference to both federal and state law. Federal law defines the term "executory contract" and thereby creates a frame of application for state law. State law generally designates the attributes of particular arrangements involving the sale of real property. Reference must be made to federal law for the definition of "executory contract" and reference must be made to state law to determine whether or not, and to what extent, the legal attributes of a particular transaction fall within the federal bankruptcy law definition. Of course, the particular circumstances and nuances involved in each case not only determine whether, and to what extent, a transaction is inured with certain state law attributes, but also operate to define whether, according to the bankruptcy law definition, the transaction is executory or not, where, because of those unique circumstances, the transaction cannot be categorized under state law.

Clearly, the transaction between Mr. Taylor and HSP is atypical. It is not the run-of-the-mill two party installment land sale contract, where the vendor has fee simple title to the property, and all that remains under the contract is for the vendee to make the future installments under the contract and for the vendor to deliver the title to the vendee upon the last installment being paid. It is, however, an installment land sale contract under Alabama law, and from that perspective, is imbued by Alabama law with certain legal attrib-

## IV. CONCLUSION

Based on the above, all counts of the Debtors' complaint, as amended, and all counts of the Defendants' counterclaim are due to be denied.

A separate order will be entered contemporaneously with this memorandum opinion.

utes, some of which appear to be executory in nature and others which are not.

Granted, the vendee in an installment land sale contract is entitled to possession of the property and acquires an equitable interest in the property. *Shirley v. McNeal*, 274 Ala. 82, 145 So.2d 415 (1962); *Mid–State Homes, Inc. v. Moore*, 460 So.2d 172 (Ala.Civ.App.1984). The obligation of the vendee under the contract to pay and the obligation of the vendor to deliver title upon completion of the payments are, however, dependent and concurrent, so that default in the performance of one excuses the performance of the other. *Catanzano v. Hydinger*, 233 Ala. 116, 170 So. 214 (1936); *Maury v. Unruh*, 220 Ala. 455, 126 So. 113 (1930). Also, the respective remedies of the parties to the contract are different than those inherent in a nonexecutory mortgagor-mortgagee relationship. Upon breach by the vendee, the vendor need not sell the property, but may retain the property, declare the contract forfeited, and sue for ejectment of the vendee and damages for breach of the agreement, and retain installment payments made as rent. *Hicks v. Dunn*, 622 So.2d 914 (Ala.1993); *Bell v. Coots*, 451 So.2d 268 (Ala.1984); *Rogers v. Newton*, 340 So.2d 768 (Ala.1976); *Majors v. State ex rel Payne*, 336 So.2d 1098 (Ala.1976); *Wainwright v. Rolling Acres, Inc.*, 289 Ala. 593, 269 So.2d 123 (1972); *McCary v. Treadway*, 289 Ala. 334, 267 So.2d 410 (1972); *Blocker v. Lowry*, 285 Ala. 448, 233 So.2d 233 (1970); *Ashurst v. Rosser*, 275 Ala. 163, 153 So.2d 240 (1963); *Sims v. City of Birmingham*, 254 Ala. 598, 49 So.2d 302 (1950); *Rogers v. Gonzalez*, 252 Ala. 313, 40 So.2d 858 (1949). The vendor may also sue to foreclose his vendor's lien against the vendee's equitable interest in the property. *Stagg v. Van Sant*, 390 So.2d 620 (Ala.1980); *Wingard v. Randall*, 269 Ala. 420, 113 So.2d 674 (1959); *Rogers v. Gonzalez*, 252 Ala. 313, 40 So.2d 858 (1949); *Qualls v. Union Central Life Ins. Co.*, 242 Ala. 619, 7 So.2d 558 (1942). The vendee may rescind the contract upon relinquishing possession of the same and sue for a return of purchase money paid or sue for specific performance on the part of the vendor and damages to the extent specific performance is impossible. *McAllister v. Altus Bank*, 578 So.2d 1266 (Ala.1991); *Clark v. Wilson*, 380 So.2d 810 (Ala.1980); *Tanner v. McClure*, 259 Ala. 142, 65 So.2d 709 (1952); *Mid–State Homes, Inc. v. Moore*, 460 So.2d 172 (Ala.Civ.App.1984). The vendee does not have the same statutory right to redemption which is an attribute of a nonexecutory mortgagor-mortgagee relationship,

## ORDER DENYING DEBTOR'S COMPLAINT TO AVOID PREFERENTIAL TRANSFER AND ORDER DENYING DEFENDANTS' COUNTERCLAIM

In conformity with and pursuant to the Memorandum Opinion entered contemporaneously herewith, it is **ORDERED:**

1. As to the Debtor's Complaint:

but instead may only accomplish redemption from forfeiture by an action for the specific performance of the contract in equity. *Gay v. Tompkins*, 385 So.2d 973 (Ala.1980).

The remedies of both the vendor and vendee would be obviated by treatment of the relationship other than as an executory contract, as would any benefit to the grantor of retaining title to the property until payments are completed. The parties would be relegated to an arrangement which they in fact did not conceive or design rather than the arrangement which they actually negotiated and desired.

The peculiarities of the arrangement between Mr. Taylor and HSP also lead to the conclusion that the contract is executory. Unlike the typical installment land sales contract, the present contract involves four parties, instead of the usual two, and the vendor does not have legal title to the property. For the contract to be fully executed, an obligation to a party other than the vendor or vendee must be satisfied and the vendor must acquire legal title to the property. If HSP does not perform its obligation to make regular monthly payments to Mr. Taylor, Mr. Taylor's ability to obtain title to the property will be jeopardized. More importantly, the contract contemplates that HSP will make monthly payments to Mr. Taylor and that those payments will, in effect, flow through Mr. Taylor to BIDB and AmSouth. Both Mr. Taylor and HSP have substantial obligations under the contract yet to perform. The flow through of the payments, along with the retention of title, are the essence of the contract; this Mr. Taylor refers to as the "lease-purchase." To hold that the contract is not executory would essentially deprive Mr. Taylor of any benefit from the contract.

Even if it were not, the relationship between the parties would be no different. It is axiomatic that one cannot convey greater title than that he or she has. Therefore, even if the deed was valid as a conveyance, HSP could not and would not have acquired legal title to the property from Mr. Taylor, but only that quantum of property that Mr. Taylor then owned: a right to possession and use that would eventually ripen into fee simple ownership. The deed would effect only a transfer of legal title at the moment the option was exercised. Exercise of the option would be dependent on HSP's payment to Mr. Taylor and Mr. Taylor's payment to AmSouth. HSP would still have, in essence, only an executory contract to convey legal title.

(a) The relief requested by the Plaintiff is **DENIED;** and

(b) Judgment is entered for the Defendant and against the Plaintiff; and

2. As to the Defendants' counterclaim:

(a) The relief requested by the Defendants is **DENIED;** and

(b) Judgment is entered for the Plaintiff and against the Defendant.

### ORDER ON MOTION FOR CLARIFICATION OF ORDER AND TO ALTER OR AMEND ORDER

This matter is before the Court on the Plaintiff's Motion for Clarification of Order and to Alter or Amend Order. The Debtor asks the Court to amend the factual finding of this Court's April 13, 1995, Memorandum Opinion on the Debtor's Complaint to Avoid Preferential Transfer and on the Defendants' Counterclaim, which provided that there was a deficiency of principal payments under the contract between the Debtor and the Defendant of *$54,900.00.* The parties agree that the amount due is *$31,900.00.* The Debtor also asks the Court to amend its Memorandum Opinion on the Debtor's Complaint to Avoid Preferential Transfer and on the Defendants' Counterclaim to clarify the Debtor's rights of specific performance under the parties' contract. The parties agree as to what modification of the memorandum's language would satisfy their concerns. For good cause shown the Court finds that the April 13, 1995, Memorandum Opinion on the Debtor's Complaint to Avoid Preferential Transfer and on the Defendants' Counterclaim is amended as:

[Editor's Note: Amendments incorporated for purposes of publication.]

The Court's Order Denying Debtor's Complaint to Avoid Preferential Transfer and Order Denying Defendants' Counterclaim remains as entered on April 13, 1995.

IT IS SO ORDERED.